662 F.2d 550
 1 Ed. Law Rep. 72
 Johann SCHMIDT and Leland Pollard, Individually and Doing
Business as Schmidt & Pollard, a Partnership; Jot
Brown, Luz Brown, and Jot Brown, Inc., a
California corporation,
Plaintiffs-Appellants,
v.
OAKLAND UNIFIED SCHOOL DISTRICT, Oakland Board of Education,
David Tucker, Jr., Melvin J. Caughell, Charles W. Goady,
Barney E. Hilburn, Lorenzo N. Hoopes, Seymour M. Rose, and
Peggy Stinnett, Defendants-Appellees.
 No. 80-4005.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1981.
Decided Nov. 5, 1981.
 
 Roger J. Marzulla, Matthews & Marzulla, San Jose, Cal., for plaintiffs-appellants.
 Michales S. Sorgen, Oakland, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before SKOPIL, FLETCHER and FARRIS, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 At issue in this appeal is the validity of an affirmative action plan (AAP) applicable to general contractors who submit bids for construction contracts solicited by the Oakland Unified School District (School District). Under Cal.Educ.Code § 39640, a school district must award to the "lowest responsible bidder" any contract for work involving more than $12,000. The School District has adopted a policy providing that, in order to be a "responsible bidder" for purposes of the California statute, a general contractor bidding on a school construction project over $100,000 must use minority-owned businesses for at least twenty-five percent of the dollar amount of the total bid.[1] The requirement is subject to numerous discretionary exceptions, described below. A low bidder who is in apparent noncompliance with the AAP has the right to an individual hearing to contest the finding that it is not a responsible bidder.
 
 
 2
 The Oakland Board of Education (School Board) is the executive arm of the School District. In February 1977, the board solicited bids for the refurbishing of the Oak Grove Campus of Oakland Technical High School. The bid specifications required conformity with the AAP. Schmidt & Pollard, a partnership engaged in general contracting whose partners, Schmidt and Pollard, are both white, submitted the low bid of $160,280. Under the Schmidt & Pollard proposal, Jot Brown, Inc., a minority-owned company, as a subcontractor, would receive approximately sixteen percent of the total dollar amount. A joint venture owned sixty-five percent by Thomas, who is white, and thirty-five percent by Cottrell, who is black, submitted the next-lowest bid of $167,000.
 
 
 3
 Because Schmidt & Pollard was the low bidder but was in apparent noncompliance with the AAP, it was granted a hearing and found not to be a responsible bidder within the meaning of the statute. Schmidt and Pollard argued that they had taken every possible measure to obtain twenty-five percent minority participation, but that their efforts had been unavailing. Finding to the contrary, the Board awarded the contract to Thomas and Cottrell.
 
 
 4
 Schmidt & Pollard, and its partners individually, and Jot Brown, Inc. brought the present action against the School District, the School Board, and the seven individual members of the School Board. Alleging that the AAP violated the equal protection clause, plaintiffs claimed damages under 42 U.S.C. §§ 1981 and 1983. Plaintiffs alternatively claimed damages on the theory that the AAP violated Cal.Educ.Code § 39640, described above.[2]
 
 
 5
 The district court held that all the defendants were immune from damages for any actions taken in good faith, and that all the defendants had acted in good faith in adopting and implementing the AAP. Finding no genuine issue of material fact, the court granted summary judgment for the defendants. The plaintiffs appeal.
 
 
 6
 * IMMUNITY
 
 
 7
 In reviewing the propriety of the grant of summary judgment on immunity grounds, we distinguish the School District and the School Board from the individual members of the School Board. School board members are entitled to a qualified immunity from money damages in section 1983 actions, for actions taken in good faith. Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Thus, with respect to the individual board members, the question is whether there was a triable issue as to their good faith in adopting and implementing the AAP.
 
 
 8
 We agree with the district court that there was not. The only evidence purportedly showing bad faith was an affidavit by the plaintiffs' attorney relating statements made by two School Board members before adoption of the AAP. One of the members stated that the county counsel had predicted the AAP would be invalidated by the courts. Another member, supporting the plan, responded: "I don't let attorneys run my business. I let them advise me on how I should run it, but I make the decisions. And no attorney's going to tell me what I can and can't do ...." The plaintiffs seek to infer that the School Board adopted the plan with knowledge that the plan was illegal.
 
 
 9
 The parties' joint pretrial statement, however, included a stipulation that, after the alleged statements by the two School Board members but before adoption of the AAP, the legal advisor to the School Board had made a contrary prediction. The legal advisor noted that a California Superior Court had refused to grant a preliminary injunction restraining implementation of the Oakland AAP, that the California Court of Appeal had affirmed, and that the California Supreme Court had declined review. He explained to the board members that the court's ruling reflected a conclusion that the plaintiffs in that litigation were unlikely to succeed on the merits, and that it could be inferred from the court's ruling that the AAP would probably be upheld.
 
 
 10
 The evidence before the district court shows at most that the School Board rejected the opinion of one attorney in favor of the subsequent opinion of its own attorney. The latter opinion was rendered in the light of an intervening development in the law. We are not persuaded that the showing made here is sufficient to create a triable issue as to the good faith of the individual board members. We therefore conclude that the district court properly granted summary judgment for the individual defendants.
 
 
 11
 The district court also held that the School Board and School District as entities were immune from damages for good faith acts. At the time of the district court's decision, the liability of a local government body under section 1983 was an open question. See Monell v. Department of Social Services, 436 U.S. 658, 701, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611 (1978) (local government bodies have no absolute immunity from damages under section 1983, but Court left open the question whether some lesser degree of immunity attaches). Shortly after the district court decision, the Supreme Court held that a local government body does not enjoy even a qualified immunity from liability under section 1983 for actions taken in good faith. See Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).
 
 
 12
 The parties agree that, with respect to the governmental defendants, Owen has undercut the basis for the district court decision. The defendants argue, however, that there are two alternative grounds for affirming the grant of summary judgment: that the district court lacked subject matter jurisdiction, and that the plaintiffs have not demonstrated a right to relief. The remainder of this opinion, which relates only to the School District and School Board as defendants, addresses those contentions.
 
 II
 SUBJECT MATTER JURISDICTION
 
 13
 The appellees argue that the summary judgment in their favor should be affirmed on the ground that the district court lacked jurisdiction. They maintain that no federal question was presented because the pleadings and supporting affidavits do not allege facts which, if true, would establish racial discrimination. Appellees' position appears to be that the bid submitted by Schmidt and Pollard was rejected not because the bidders themselves are not minorities, but because less than twenty-five percent of the dollar amount of their bid was targeted for minority-owned enterprises. Schmidt and Pollard, they argue, were therefore not discriminated against because of their race.
 
 
 14
 The appellees' contention borders on the frivolous. A white general contractor may meet the twenty-five percent requirement either by subcontracting to a minority-owned firm or, as was done here by Thomas, by entering into a joint venture with another general contractor that is minority-owned. If either Schmidt or Pollard had been a member of one of the minority groups specified in the AAP, the proposal of their partnership would have been accepted. It is specious, therefore, to argue that the plaintiffs did not allege racial discrimination. Appellees' reliance on Associated General Contractors v. San Francisco Unified School District, 616 F.2d 1381 (9th Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980), is misplaced, for in that case the court expressly held that a similar complaint asserted a federal question. See 616 F.2d at 1384. That the court's ultimate disposition of a pendent state claim rendered resolution of the federal constitutional question unnecessary does not alter this result.
 
 III
 THE MERITS
 
 15
 We now confront the major issue presented by this appeal. The appellees argue, in effect, that the grant of summary judgment should be affirmed on the basis that, even if all the allegations of the complaint are true, the plaintiffs have no right to relief on the stated claims. With respect to the federal claim, the appellees argue that the AAP is constitutional. With respect to the state claim, the appellees maintain that California law does not permit money damages for the particular claims advanced here. We agree that the Oakland plan is constitutional, and decline to pass on the availability of money damages under state law.
 
 
 16
 A. Constitutionality of Affirmative Action Plan.
 
 
 17
 The question whether a so-called affirmative action plan violates equal protection was first addressed by the Supreme Court in Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). The challenge was to an admissions program adopted by the medical school of the University of California at Davis. Under that program, sixteen of the one hundred places in the entering class were specifically reserved for minority applicants. Bakke, a white male whose application had been rejected, alleged that he would have been accepted but for the Davis AAP. He argued that the school had violated Title VI of the Civil Rights Act of 1964[3] and the equal protection clause.
 
 
 18
 Five Justices, concluding that an action violates Title VI only if a similar state action would violate equal protection, reached the constitutional question. See Bakke, 438 U.S. at 287, 98 S.Ct. at 2746 (Powell, J.), 328, 355, 98 S.Ct. 2767, 2781 (Brennan, White, Marshall, and Blackmun, JJ.). As to the equal protection question, Justice Powell expressed the view that all racial classifications which exclude individuals from the enjoyment of some opportunity, including those classifications operating in favor of minorities, call for strict scrutiny. Id. at 305, 98 S.Ct. at 2756. Applying that standard, he concluded that a state university has a compelling interest in attracting a diverse student body, but that the strict racial quota imposed by the Davis plan was not necessary to achievement of that goal. Id. at 314-19, 98 S.Ct. at 2760-63. He held, therefore, that the Davis program violated equal protection. Id. at 320, 98 S.Ct. at 2763. Justice Powell then stated, however, that in his view race may be considered as one factor in an admissions program aimed at achieving student diversity.[4]
 
 
 19
 Justices Brennan, White, Marshall, and Blackmun joined in an opinion concurring and dissenting. On the equal protection question, they would have held that racial classifications designed to further remedial purposes were subject only to an intermediate level of scrutiny; i. e., the classification must be substantially related to an important governmental interest. Id. at 359-62, 98 S.Ct. at 2783-85.[5] They found the Davis AAP substantially related to the important state interest in remedying the effects of past societal discrimination and, therefore, constitutional. Id. at 362, 369-79, 98 S.Ct. at 2784, 2788-94.
 
 
 20
 Justice Stevens, concurring and dissenting, was joined by the Chief Justice and by Justices Stewart and Rehnquist. The opinion by Justice Stevens concluded that the Davis AAP violates Title VI, and did not reach the equal protection issue. Id. at 411-12, 421, 98 S.Ct. 2809-10, 2815.
 
 
 21
 Thus, a majority of five Justices held that a state university admissions program may not employ strict racial quotas, one of the five reaching that decision on constitutional grounds and the other four on statutory grounds. A separate majority of five Justices, however, held that a state university admissions program may take race into account as one factor. There was no majority on the issue of the standard of review.
 
 
 22
 In Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Court addressed the constitutionality of the "minority business enterprise" provision of the federal Public Works Employment Act of 1977. See 42 U.S.C. § 6705(f)(2). Under that provision, no federal grant for a local public works project may be made without assurance by the applicant that at least ten percent of the amount of the grant will be expended for minority business enterprises. The statute and the implementing regulations allow for administrative waivers analogous to those embodied in the Oakland plan. See Fullilove, 448 U.S. at 468-72, 100 S.Ct. at 2769-72. An aggrieved white contractor argued that the statutory provision violated equal protection.
 
 
 23
 The Chief Justice, in an opinion joined by Justices White and Powell, found the plan constitutional. The opinion concluded that ending procurement practices that can perpetuate the effects of prior discrimination is a legitimate congressional objective. 448 U.S. at 478, 100 S.Ct. at 2774-75. The Chief Justice found it significant that the plan allowed for administrative waivers. Id. at 487-89, 100 S.Ct. at 2779-80. The standard of review was not explicitly stated,[6] but Justice Powell wrote separately to repeat his belief, expressed in Bakke, that strict scrutiny should be applied. See id. at 496, 100 S.Ct. at 2783. Justice Marshall, joined by Justices Brennan and Blackmun, concurred in the result but applied intermediate scrutiny. Id. at 518-19, 100 S.Ct. at 2795-96. Justice Stewart, joined by Justice Rehnquist, dissented, agreeing with Justice Powell that all racial classifications are suspect, id. at 523-27, 100 S.Ct. at 2798-2800, but rejecting Justice Powell's conclusion that the statute survives strict scrutiny. Justice Stevens, not specifying the standard of review, also dissented. Id. at 532-54, 100 S.Ct. at 2802-14.
 
 
 24
 With one important exception, the AAP upheld in Fullilove was identical in all pertinent respects to the Oakland plan. Both plans required applicants for publicly sponsored construction contracts to provide assurances that a specified proportion of the contract amount would go to minority-owned enterprises.[7] Both plans provide for administrative waivers of the set-aside requirement in the discretion of the applicable governmental body.
 
 
 25
 The one crucial distinction between the two plans is that the program considered in Fullilove was mandated by Congress, whereas the AAP at issue here was adopted by a local school board. The Chief Justice in Fullilove observed: "(h)ere we pass, not on a choice made by a single judge or a school board, but on a considered decision of the Congress and the President." Id. at 473, 100 S.Ct. at 2772.
 
 
 26
 Although the intended import of that distinction is not entirely clear, the opinion at a later point alludes to section 5 of the fourteenth amendment, noting, id. at 476-77, 100 S.Ct. at 2773-74, that section 5 authorizes Congress to enact legislation aimed at eliminating the effects of past discrimination.[8] Because section 5 was invoked to establish the legitimacy of the government interest asserted as a justification for the challenged statute, and because no comparable constitutional authority can be invoked by a local school board, we do not automatically extend the result in Fullilove to the present case. Accordingly, the constitutionality of the Oakland plan must be discretely analyzed.
 
 1. Objectives of Plan
 
 27
 The policies that the Oakland School Board's affirmative action program is designed to promote are recited in the text of the plan. One objective is "to assure that the construction program of the Oakland Unified School District does not perpetuate the presently evidenced effects of past discrimination in the construction industry against minority-owned firms." The School Board's intent was "to overcome the unwillingness of the construction industry's non-minority-owned firms to participate in a significant way with minority-owned firms when contracting for school construction projects."[9]
 
 
 28
 As noted above, the Supreme Court has not yet decided the standard under which a benign racial classification is to be reviewed. We need not decide the applicable standard in this case because we find that, under any of the recognized equal protection standards, the Oakland plan is justified by the School District's interest in remedying the lingering effects of past discrimination in the school construction industry.
 
 
 29
 There can be no doubt today as to the importance of the asserted objective. Five Justices in Bakke explicitly recognized the important state interest in ameliorating the disabling effects of identified discrimination. See Bakke, 438 U.S. at 307, 98 S.Ct. at 2757 (Powell, J.), 362 (Brennan, White, Marshall, and Blackmun, JJ.).[10] Moreover, the equal protection clause itself, although lacking a state counterpart to section 5, requires state officials to be cognizant of the need for racial equality. The prevalence of state constitutional provisions mandating equal protection demonstrates the states' own perceptions that they have strong interests in fostering racial equality. See also North Carolina State Board of Education v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 1285, 28 L.Ed.2d 586 (1971) (school district may conclude that, as matter of educational policy, racial balance desirable quite apart from constitutional requirements). Cf. United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (Civil Rights Act of 1964 not violated by private employer's affirmative action plan, where purpose was to open up employment opportunities in historically segregated job categories); United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (upholding county apportionment plan structured to ensure that the percentage of districts in which there were non-white majorities would roughly approximate the percentage of non-whites in the county).
 
 
 30
 The appellants argue, however, that regardless of whether a state has an important interest in remedying discriminatory effects, the School District does not. They argue that a political subdivision can assert such an interest only if it has made, and is competent to make, findings of identified discrimination. Although we do not share appellant's view on this point, there is some support for the argument in the opinion of Justice Powell in Bakke, 438 U.S. at 307-10, 98 S.Ct. at 2757-59, repeated in Fullilove, 448 U.S. at 516, 100 S.Ct. at 2794, although four other Justices have adopted a contrary position, see Bakke, 438 U.S. at 366-67 n.42, 98 S.Ct. at 2787 n.42 (Brennan, White, Marshall, and Blackmun, JJ., concurring and dissenting), and the remaining four Justices have not expressed a view on this question.
 
 
 31
 We acknowledge that state law may prevent a political subdivision of a state from performing selected functions, see Associated General Contractors v. San Francisco Unified School District, 616 F.2d 1381 (9th Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980). However, we see nothing in the United States Constitution specifying how a state must allocate internally the exercise of a power that the state itself is constitutionally authorized to perform.
 
 
 32
 Even assuming arguendo that the Constitution limits the manner in which various functions may be allocated within a state, we conclude that the limitations suggested by Justice Powell would not aid the appellants in this case. In reaching this conclusion, we stress that the asserted interest is not the general one of remedying past societal discrimination, an interest rejected by Justice Powell. See note 10 supra. We are dealing, rather, with a more focused attempt to remedy the effects of past discrimination in one particular industry, or, more accurately, in one particular sector of an industry school construction contracts.
 
 
 33
 Most importantly, the findings that Justice Powell would require (and that appellants urge are required) have been made in this case. According to the declaration submitted by school superintendent Ruth B. Love, non-white contractors complained that they had been excluded from participation in the bids of white general contractors. Numerous meetings were held between School District officials and construction industry representatives. These informal meetings were followed by public hearings, at which the allegation that non-white firms were excluded were repeated. The Oakland affirmative action plan, adopted after these meetings and public hearings, contained in its text the School Board's finding that non-minority-owned contracting firms had been unwilling to participate with minority-owned firms in school construction contracts.
 
 
 34
 The School Board's findings are supported by the statistical disparity between the sizeable minority population of the community and the meager extent to which minority-owned enterprises have benefited from the award of school construction contracts. As of July 1, 1970, blacks alone constituted 34.5% of the Oakland city population. Bureau of the Census, Statistical Abstract of the United States, Table 28 at 25 (81st ed. 1980). According to the declaration of Superintendent Love, from 1947 until adoption of the affirmative action plan in 1975, the School Board awarded 135 construction contracts for amounts of at least $100,000 each. Of the 135, only one was awarded to a minority contractor, and only two were awarded to joint ventures in which there was participation by minority-owned firms. The disparity found by the School Board at the local level mirrors the disparity found by Congress nationally. See Fullilove, 448 U.S. at 459, 461, 463, 467, 478, 100 S.Ct. at 2765, 2766, 2767, 2769, 2774.
 
 
 35
 It is equally clear that the School Board has the technical competence to make such findings. It has ample experience in evaluating school construction bid proposals, and in analyzing the operations of those firms whose bids it has considered.
 
 
 36
 Finally, it is perfectly appropriate that the School Board be the body to assert an interest in remedying the effects of past discrimination in this particular industry. The School Board is charged with the vital responsibility of educating children. The declaration of Superintendent Love states that eighty-four percent of the students enrolled in the School District are non-white. For the School District to perpetuate the effects of past discrimination in school construction contract awards could seriously undermine its credibility in a community with so large a non-white population, thereby impairing its capacity to educate children. We see nothing improper in the School District's laudable desire to set an example to the children whom it is responsible for educating. To the contrary, the AAP is highly relevant to the School District's mission.
 
 2. Means Employed
 
 37
 The next question, then, is whether the means chosen by the School District is sufficiently tailored to the objective of remedying past discrimination in the school construction industry. Several considerations are pertinent here.
 
 
 38
 First, the Oakland program does not result in the awarding of a contract to any bidder who does not otherwise satisfy the statutory requirements. The successful bidder must be found financially responsible, and its bid must be lower than that submitted by every other responsible bidder. Thus, as in Bakke, only those applicants who meet certain minimum standards can ultimately benefit from the program.
 
 
 39
 Second, the twenty-five percent figure adopted by the School Board is not unnecessarily high. The opinion of Justices Brennan, White, Marshall, and Blackmun in Bakke stated approvingly that the minority percentage adopted by the University of California at Davis did not exceed the percentage of minorities in the California population. See Bakke, 438 U.S. at 374 n.58, 98 S.Ct. at 2791 n.58. A similar observation may be made here. As noted earlier, the Oakland population as of July 1, 1970, was more than 34.5% non-white. Thus, the twenty-five percent figure adopted does not seem excessive.
 
 
 40
 Finally, the Oakland plan is closer to one merely considering race as a factor, a scheme expressly approved by five Justices in Bakke, than to a regime of strict racial quotas. Like the federal statute upheld in Fullilove, the plan strongly encourages bidders to expend a specified percentage of the contract price on minority-owned contractors or subcontractors, but contains numerous exceptions that provide ample flexibility. The School Board has the discretion to award a contract to a bidder who has not met the twenty-five percent requirement if the contractor has taken every possible measure to comply, it is not practicable to demand compliance in the particular case, and it is in the best interests of the School District to award the contract. A second exception authorizes the School Board to depart from the twenty-five percent requirement when the contract consists primarily of work in highly specialized crafts for which there are insufficient minority participants. Third, the plan contemplates its own revision if the level of participation by minority-owned businesses decreases. This feature makes it possible for the School Board to respond flexibly depending on the success of the program. Finally, the evidentiary hearing granted to any contractor whose low bid is rejected because of apparent noncompliance with the requirements of the plan further assures individualized treatment. Thus, as was stressed in Fullilove, the provisions for discretionary administrative waivers enhance the precision with which the plan fulfills the desired objective.
 
 
 41
 For the above reasons, we hold that the Oakland plan comports with equal protection regardless of which standard of review governs benign racial classifications.
 
 
 42
 B. The State Claim.
 
 
 43
 In Associated General Contractors v. San Francisco Unified School District, 616 F.2d 1381 (9th Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980), this court held that a San Francisco Unified School District policy very similar to the Oakland plan violated Cal.Educ.Code § 39640, which requires that school construction contracts be awarded to the "lowest responsible bidder." There are important distinctions between that case and the present one, however. The San Francisco School District had made no finding of past discrimination. 616 F.2d at 1385 n.4; see also, Price v. Civil Service Commission, 26 Cal.3d 257, 604 P.2d 1365, 161 Cal.Rptr. 475 (1980). It does not appear from the opinion whether administrative waivers were available. Furthermore, there is some indication here that the California courts would approve the Oakland plan. The Superior Court refused to grant a preliminary injunction to the Construction Industry Council enjoining the plan's operation, and that decision was summarily affirmed by the Court of Appeal. Hearing was denied by the state Supreme Court. See supra, 662 F.2d at 554. See also 42 Cal.Op.Att'y Gen. 169 (1963) (school district may require inclusion of antidiscrimination clauses in school construction contracts). Finally, the plaintiffs in the San Francisco case sought only non-monetary relief. The plaintiffs here seek only money damages. As the appellants conceded at oral argument, there is a serious question whether, under California law, damages would be available for the violation of section 39640, if such a violation were ultimately found.
 
 
 44
 The appellees, citing United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), argue that we ought not address this state law issue. We agree. The Court in Gibbs, noting the existence of pendent jurisdiction over related state law claims, stressed nonetheless that the power to assert pendent jurisdiction need not be exercised. Id. at 725-26, 86 S.Ct. at 1138-39. Considerations of comity enter into this determination. Id. at 726, 86 S.Ct. at 1139. The Court added, "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." Id. (footnote omitted).
 
 
 45
 We think the prudent course in this case would be to refrain from deciding the state law issues. There has been no trial, and no significant time investment in the issue by either the district court or this court. The availability of money damages under state law, for action taken pursuant to an affirmative action plan allegedly violative of state law, is a highly sensitive issue. In the interests of comity, we choose to defer to the views of the California courts.
 
 
 46
 The judgment of the district court is affirmed, with the reservation that the appellants remain free to pursue their state law claims in the California courts.
 
 
 47
 AFFIRMED.
 
 FARRIS, Circuit Judge, concurring:
 
 48
 I concur except for that portion of part III(B) of the opinion which discusses the merits of the state claim. The Supreme Court in United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), held that the assertion of pendent jurisdiction is discretionary. Here the federal claim has been dismissed by summary judgment. We therefore properly decline to exercise pendent jurisdiction over the state claim. See Wren v. Sletten Constr. Co., 654 F.2d 529, 536 (9th Cir. 1981); Hodge v. Mountain States Tel. & Tel. Co., 555 F.2d 254, 261 (9th Cir. 1977); Wham-O-Mfg. Co. v. Paradise Mfg. Co., 327 F.2d 748, 753 (9th Cir. 1964).
 
 
 49
 I would leave to the California state courts the task of applying Cal.Educ.Code § 39640 and determining the relevance of Associated General Contractors v. San Francisco Unified School District, 616 F.2d 1381 (9th Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980). I question the propriety of making pronouncements on state law issues and precedent after properly deciding not to address the state law claim.
 
 
 
 [1]
 The AAP defines a minority person as one whose ancestry is black, Asian, Latin American, American Indian, or any native Pacific Island group
 
 
 [2]
 The complaint also alleged unspecified violations of the due process clause, the privileges and immunities clause, and various California constitutional and statutory provisions other than section 39640. Those claims are not argued on appeal
 
 
 [3]
 Pub.L. 88-352, Title VI, § 601 (July 2, 1964), 78 Stat. 252, 42 U.S.C. § 2000d, provides:
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 [4]
 The Justices disagreed as to the propriety of reaching this issue. Justice Powell, having concluded that race could be considered, stated that the "California court's judgment" must be reversed insofar as it enjoins the university from considering race as a factor in the future. Bakke, 438 U.S. at 320, 98 S.Ct. at 2763. Justice Stevens, dissenting, argued that the only state court enjoining the university from considering race was the trial court, and that the trial court's decision had been superseded by that of the California Supreme Court, which contained no such injunction. Accordingly, he concluded that the issue should not be addressed. Id. at 408-11, 98 S.Ct. at 2808-10
 
 
 [5]
 There is some uncertainty as to the view of Justice White on this question. Although he co-authored the opinion and wrote a separate opinion expressly reaffirming that the joint opinion reflected his views on equal protection, see Bakke, 438 U.S. at 387, 98 S.Ct. at 2797, he also joined Part III-A of Justice Powell's opinion. See id. at 387 n.7, 98 S.Ct. at 2797 n.7. In Part III-A, Justice Powell concluded that strict scrutiny should apply. Id. at 287-91, 98 S.Ct. at 2746-49. The subsequent decision in Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), does not dispel the uncertainty, because Justice White there joined the opinion of the Chief Justice, which did not specify a standard
 
 
 [6]
 The opinion states that racial classifications must be afforded "close examination." 448 U.S. at 472, 100 S.Ct. at 2771. See also id. at 491, 100 S.Ct. at 2781 ("most searching examination"). It also spoke, however, of according "great weight to the decisions of Congress." Id. at 472, 100 S.Ct. at 2772 (quoting Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee, 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973)). The opinion further states that it does not adopt any of the analyses articulated in Bakke, and that the minority business enterprise provision would survive judicial review under either of the tests enunciated in Bakke. Id. at 492, 100 S.Ct. at 2781-82
 We note one reference to the "rational basis" test. Id. at 475, 100 S.Ct. at 2773. That reference, however, concerned the question whether the statute could be tied to the commerce clause, not whether the statute violated the equal protection clause.
 
 
 [7]
 We recognize that the present case involves a numerical goal of 25%, while the analogous figure in Fullilove was only 10%. For the reasons given in the text, see infra 662 F.2d at 559-560, that distinction does not affect the outcome of this case
 
 
 [8]
 Section 5 of the fourteenth amendment empowers Congress to pass laws designed to effectuate the purposes of the fourteenth amendment; Congress is not limited to prohibiting activities that would be held by the courts to violate the fourteenth amendment. See Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)
 
 
 [9]
 Because the text of the affirmative action plan contains an express statement of the School Board's intention to promote the interests that we now consider in this opinion, this is not a case in which an interest is asserted only as an afterthought. See United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 101 S.Ct. 453, 464, 66 L.Ed.2d 368 (1980) (Brennan, J., dissenting)
 
 
 [10]
 Justice Powell limited his conclusion to "identified" discrimination, which he regarded as more focused than general "societal" discrimination. Bakke, 438 U.S. at 307, 98 S.Ct. at 2757. The other four Justices went even farther, finding an important state interest in remedying even societal discrimination. Id. at 362, 98 S.Ct. at 362