**OHIO CONTRACTORS ASSOCIATION, et al., Plaintiffs-Appellees,**

v.

**William KEIP, et al., Defendants-Appellants,**

and

**National Association of Minority Contractors, et al., Intervening Defendants-Appellants.**

No. 82–3822.

United States Court of Appeals, Sixth Circuit.

Argued March 8, 1983.

Decided July 12, 1983.

Rehearing Denied Sept. 7, 1983.

Robert B. McAlister (argued), Thomas L. Long, Alexander, Ebinger, Fisher, McAlister & Lawrence, Jessie C. Roberson, Columbus, Ohio, for Keip, et al.

Samuel H. Porter (argued), Fred G. Pressley, Jr., Jacquelin Davis Keister, Porter, Wright, Morris & Arthur, Columbus, Ohio, for National Ass'n of Minority Contractors, et al.

John C. Elam (argued), Tom Ridgley, Columbus, Ohio, for plaintiffs-appellees.

James H. Banks, David M. Bidwell, Banks, Bidwell Co., L.P.A., J. Statler Beachler, Columbus, Ohio, for amicus curiae NAACP.

Susan W. Wanat, John M. Cannon, Mid-America Legal Foundation, Chicago, Ill., for amicus curiae Mid-America Legal Foundation and Committee on Academic Nondiscrimination and Integrity.

Before LIVELY and ENGEL, Circuit Judges, and SWYGERT, Senior Circuit Judge.[*]

LIVELY, Circuit Judge.

This appeal concerns the validity of an Ohio law which requires state officials to set aside designated percentages of state contracts for bidding by minority business enterprises only. The statute also requires contractors awarded state contracts to purchase a designated percentage of goods and services from minority businesses and to award a designated percentage of subcontracts to such businesses. An association of contractors and several individual white contractors brought this action seeking a declaratory judgment that the statute is void and unenforceable and an injunction to prevent its enforcement. The district court found that the statute violates the equal protection clause of the Fourteenth Amendment and granted a permanent injunction. The defendants, state officials charged with enforcement of the law, appealed. After the district court denied a stay pending appeal this court granted a stay and expedited the appeal.

I.

The Ohio General Assembly passed and the Governor signed a "minority business enterprise" (MBE) act in November 1980. The act requires the defendant director of the department of administrative services to select from the state construction contracts to be awarded "a number of con-

[*] The Honorable Luther M. Swygert, Senior Judge, U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

tracts whose aggregate value is approximately five per cent of the total estimated value of contracts to be awarded in the current fiscal year. The director shall set aside the contracts so selected for bidding by minority business enterprises only." Ohio Revised Code (ORC) § 123.151(C)(1). The act also requires every contractor awarded a contract to make "every effort to ensure that certified minority business subcontractors and materialmen participate in the contract." ORC § 123.151(C)(2)(a). Each state contract must contain a provision that "the contractor, to the extent that it subcontracts work, will award subcontracts totaling no less than five percent of the total value of the contract to [certified] minority businesses . . . and that the total value of both the materials purchased from [certified] minority businesses . . . and of the subcontracts awarded, to the extent that it subcontracts work, to such minority businesses will equal at least seven percent of the total value of the contract. . . ." ORC § 123.151(C)(2)(b). Approximately fifteen percent of the estimated total value of all state contracts for purchases of equipment, materials, supplies or contracts for the purchase of insurance is required to be selected and set aside for bidding by minority business enterprises only. ORC § 125.-081(A).

The MBE act contains provisions for waiver and modification of the set-aside provisions on application of a contractor who, after good faith effort, is unable to comply. The act's definition of minority business enterprise is—

> an individual, partnership, corporation, or joint venture of any kind that is owned and controlled by United States citizens, residents of Ohio, who are members of one of the following economically disadvantaged groups: Blacks, American Indians, Hispanics, and Orientals.

ORC § 122.71(E)(1). Any person who misrepresents himself as eligible under this definition for the purpose of obtaining benefits under the MBE act is declared guilty of theft by deception.

In their complaint, filed April 30, 1982, the plaintiffs sought a declaration that specified provisions of the Ohio MBE act, contained in ORC §§ 122.71, 123.151 and 125.081 "are unconstitutional and null and void on their face" for violation of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 42 U.S.C. §§ 1981 and 1983. The district judge conducted a bench trial at which he heard testimony and received a large number of documents as exhibits. The district court concluded that the Ohio MBE act violates the equal protection clause of the Fourteenth Amendment and that the statutory provisions relied upon by the plaintiffs contain guarantees which are coextensive with the equal protection clause, thus dispensing with the need for separate treatment of the statute-based claims. Though the district court discussed the standards by which a race-related remedy is to be tested, it concluded that even if the state interest addressed in the Ohio MBE act was clearly identified and was of sufficient importance to justify use of a race-conscious remedy, the act is constitutionally defective because of the means chosen by the legislature to deal with the problem. The district court identified features of the Ohio MBE act which it found deficient as follows: (1) it has no durational limitation; (2) it imposes an "undue burden" on non-minority contractors; (3) it permits "unjust participation" by minority contractors who have suffered no economic disadvantage on account of race; and (4) there are less intrusive means available for obtaining the results sought by the act.

Though the district court concluded that it was not necessary to determine whether the Ohio legislature had identified a compelling state interest in enacting the MBE act, its opinion dealt extensively with this issue, and the parties have done the same. The district court found "scant support" for the remedy chosen either in the statement of purpose contained in the bill which finally became the MBE act or in the legislative history. The district court also stated that the General Assembly made no findings that the numerical imbalance which existed

between construction contracts awarded to white and minority contractors "resulted from unlawful discrimination by state officials in the contract awarding process." The parties have argued both issues on appeal: the existence of a compelling governmental interest and the choice of an appropriate means of satisfying a legitimate and important state purpose.

## II.

### A.

The defendants (state officials) and intervening defendants (minority contractors) have filed separate briefs. They will be referred to in this opinion collectively as defendants. The primary argument of the defendants is that this case is controlled by the decision of the Supreme Court in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), and that the district court misapplied *Fullilove.* In *Fullilove* the Supreme Court found a federal law which established a preference for minority contractors to be a constitutional exercise of congressional authority. The statute challenged in *Fullilove* required local governmental units which received funds under a public works program to use 10% of the funds to procure services or supplies from businesses owned and controlled by members of statutorily defined minority groups. The federal act which contained this MBE provision was an appropriation measure with a life span of two years. The plaintiffs in *Fullilove* contended that the MBE provisions of the act were unconstitutional on their face.

The plaintiffs agree that this appeal is controlled by *Fullilove* and argue that the district court interpreted *Fullilove* correctly, particularly when it is read with Justice Powell's opinion in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Neither *Fullilove* nor *Bakke* produced a majority opinion from the Supreme Court and we depend on the several plurality opinions for guidance.

### B.

The opinion of Chief Justice Burger (concurred in by Justices White and Powell) in *Fullilove* found authority for Congress to adopt legislation earmarking a portion of funds appropriated for public works to be spent with minority business enterprises on the basis of a "backdrop" which made members aware of the problem and the reasons for the legislation. 448 U.S. at 467, 100 S.Ct. at 2769. This "backdrop" included committee reports compiled in connection with other legislation, a report of the U.S. Civil Rights Commission and reports of the operations of an agency of the Department of Commerce established pursuant to executive orders. With this background the Court found it "inconceivable that Members of both Houses were not fully aware of the objectives of the MBE provision and of the reasons prompting its enactment." *Id.*

The Chief Justice also made it clear that Congress is not required to state its "findings" in a preamble or compile a "record" comparable to that made in judicial or administrative proceedings in order to legislate on a subject within its purview. *Id.* at 478, 100 S.Ct. at 2774. Justices White and Powell concurred in the Burger opinion, and there is no indication that the other Justices who concurred in the result would have declined to join in the portion of the opinion dealing with the importance of background or the need for findings.

We believe the district court took too restrictive a view of the facts surrounding enactment of the Ohio MBE act. While the act did not contain a preamble which stated in so many words that its purpose was to correct past practices by which the state was involved in discrimination against minority contractors its purpose and objective were absolutely clear from the text and the hearings and floor debate which preceded final enactment. In addition, this legislation was considered and adopted against a "backdrop" which must have made the members aware of the problem and the necessity for action.

Members of the General Assembly were aware of a 1967 decision of the United

States District Court for the Southern District of Ohio which found that the state had become "a joint participant" with private industry and certain craft unions in a pattern of racially discriminatory conduct which excluded black laborers from work on public construction projects. *See Ethridge v. Rhodes,* 268 F.Supp. 83 (S.D.Ohio 1967). A series of executive orders issued by the Governor of Ohio subsequent to 1967 was designed to increase participation by members of minority groups in state contracts. These orders were circulated to members of the legislature while the MBE act was under consideration. In addition, the General Assembly had adopted legislation in 1977 which required a degree of affirmative action in state contracting and was construed by some state agencies to require a "set aside" of a portion of designated state contracts for minority bidders. This statute was immediately attacked in a state court as facially unconstitutional. The Court of Common Pleas of Franklin County, Ohio in its unpublished opinion in *Ohio Building Chapter v. Jackson,* decided September 28, 1979, stated:

> This Court finds from the evidence submitted that there exists in the awarding of state contracts a discrimination against the minority groups specified in [the act]. The Court finds that there is a compelling need to correct this discrimination.

Copies of this unappealed decision were circulated to the members of the General Assembly. In addition the members were informed of the findings of racial discrimination in state contracting made in connection with an earlier joint resolution of the legislature and the contents of the report of a special "task force" established by the state attorney general which found a severe numerical imbalance in the amount of business the state did with minority groups. The task force reported that during the 1975–77 biennium minority businesses constituted 7% of all Ohio businesses but received less than 0.5% of state purchase contracts.[1] Further, a study performed by the

Ohio Department of Administrative Services showed that in the period from 1959 to 1975 the state paid out $1.14 billion in general construction contracts. Only 0.24% of these payments went to minority businesses.

When viewed against this "backdrop" there can be no doubt that the members of the Ohio legislature understood the situation which produced the MBE act and the purpose for which it was offered. Since the General Assembly was not required to make formal findings it is clear from the overwhelming approval of the MBE act that the members accepted the findings of Ohio courts, executive department investigations and earlier studies by committees of the legislature itself.

### C.

The plaintiffs argue that even if it is granted that the purpose of the Ohio MBE act is sufficiently stated and that the legislative findings were otherwise adequate, only Congress is competent to eliminate the present effects of past racial discrimination by means of race-conscious remedies. Both Chief Justice Burger in his three-judge opinion and Justice Powell in his separate concurring opinion in *Fullilove* emphasized the particular responsibility and competence of Congress in identifying and remedying past discrimination:

> It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees.

448 U.S. at 483, 100 S.Ct. at 2777 (Burger, Ch. J.).

> In addition, Congress has been given the unique constitutional power of legislating to enforce the provisions of the Thirteenth, Fourteenth, and Fifteenth Amendments.

---

1. Though the 0.5% figure actually referred to the department of transportation only, the degree of imbalance in the contracts of this major state contracting body is clear.

448 U.S. at 500, 100 S.Ct. at 2786 (Powell, J.) (footnote omitted). Both Justices were emphasizing that the Constitution itself in Section 5 of the Fourteenth Amendment,[2] bestows specific power on Congress to enforce the provisions of the Amendment. In making this point the Court was pointing out the difference between specific equal protection violations identified by Congress and the attempts of other governmental units to remedy general "societal discrimination" with race-conscious measures which have the effect of discriminating against members of the majority. This difference was the decisive factor in the Court's conclusion that the plan adopted by the California Board of Regents violated the equal protection clause. *Bakke,* 438 U.S. at 310, 98 S.Ct. at 2758 (Powell, J.).

Though Justice Powell in *Fullilove* referred to the power of Congress as "unique" we believe he meant the power was "notable" or "unequaled," not "sole" or "exclusive". The Supreme Court has consistently approved enforcement of the provisions of the Fourteenth Amendment by public bodies other than Congress. The entire history of school desegregation since 1954 is one of enforcement of the equal protection clause by federal courts. In *United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), the Supreme Court upheld the constitutionality of a New York reapportionment law which was based in part on racial factors. There was no suggestion in any of the Court's opinions that the New York legislature was not competent to identify and remedy an apportionment plan which violated provisions of the Voting Rights Act of 1965. Further, in *Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), this court upheld a racial preference plan for achieving a more equitable representation of black sergeants on the Detroit police force. In doing so we found the Detroit Board of Police Commissioners "a public body with competence to act." *Id.* at

694. *See also Schmidt v. Oakland Unified School District,* 662 F.2d 550, 559 (9th Cir. 1981), *vacated and remanded on other grounds,* 457 U.S. 594, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982).

■ Without Section 5 of the Fourteenth Amendment Congress would have no explicit authority to enforce the equal protection clause against a state. However, Section 1 of the Fourteenth Amendment speaks directly to the states: "nor [shall any state] deny to any person within its jurisdiction the equal protection of the laws." No enabling provision is required to authorize a state government to enact legislation to prevent the denial of equal protection to persons within its jurisdiction. The prohibition against denial of equal protection carries with it the power to prevent such denial and to remedy past violations. When a state legislature takes steps in compliance with the equal protection clause it is acting in the same capacity as that of Congress in adopting legislation to implement the equal protection component of the Fifth Amendment's due process clause. *E.g.* Section 717 Pub.L. 92–261, the Equal Employment Opportunity Act of 1972, which extended the obligations of equal employment opportunity to the federal government as an employer, 42 U.S.C. § 2000e–16 (1976); Section 310 Pub.L. 95–454, the Civil Service Reform Act of 1978, 5 U.S.C. § 7201 (1976 ed., Supp. III), which states an antidiscrimination policy in federal employment and requires programs of minority recruitment by executive agencies. In each case a legislative body is requiring compliance by the components of the government of which it is a part with constitutional commands directed to that government. It is not acting to enforce a constitutional command against a different sovereign as when Congress acts under the Fourteenth Amendment.

### D.

We conclude that the Ohio General Assembly is a competent body to identify past

---

**2.** "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

discriminatory practices in which the state has participated to the detriment of minority groups living within the state. In enacting the Ohio MBE act the General Assembly did identify such practices in the area of state contracts and purchases and it selected a remedial program strikingly similar in its main features to the one approved by the Supreme Court in *Fullilove*. Since the compelling nature of the governmental interest in halting racial discrimination by the state itself is clear, the only remaining inquiry concerns the means chosen to achieve the elimination of vestiges of the wrongs of the past.

## III.

### A.

The district court concluded that the Ohio MBE act was flawed because it imposes an impermissible burden on non-minority contractors. In reaching this conclusion the district court examined the percentage of minority set-asides in relation to the total construction contracts in Ohio during the first year of operation under the MBE act and found that it exceeded the percentage set aside under the federal statute approved in *Fullilove*. There were two sets of figures available for comparison. The district court chose a narrow market, that of construction work of the type usually contracted for by a state government. However, when the total construction market is considered, as was done in *Fullilove,* the percentage of contracts set aside, measured by dollar volume, was significantly lower. This "burden" on non-minority contractors—the amount they were excluded from bidding on—was less than one percent of the total.

The district court was also concerned with the operational differences between the federal statute upheld in *Fullilove* and the Ohio MBE act. Under the Ohio law non-minority contractors are completely excluded from bidding on the set-aside contracts. Under the federal act, the grantee of federal funds, which was usually a state or local government, could pass the 10% set-aside obligation through to the prime

contractor who could then determine how the percentage would be achieved. This is a difference in method only, not in result. In the final analysis non-minority contractors under the federal plan could receive no more than 90% of any grant of funds to a particular grantee. There are no intermediaries to exercise discretion on how to achieve the mandated results under the Ohio plan. The state is spending its own funds in direct dealings with contractors, not allocating funds received from another source.

It is clear that members of the majority can be required to bear some of the burden which inevitably results from affirmative efforts to rectify past discrimination. Even if it is assumed that the plaintiffs in this action are innocent of discriminatory conduct themselves, they are part of a group which did reap competitive benefit from past discriminatory practices of the state that have virtually excluded minority contractors from state business. It was within the power of the General Assembly to require the non-minority contractors to assume a reasonable burden. *See Fullilove,* 448 U.S. at 484–85, 100 S.Ct. at 2777–78.

The state has chosen to remedy the effects of *its own* past discriminatory practices by means of a program which imposes relatively light burdens on the majority group which was in position to benefit from those practices. As we stated in *Young:*

> A racial preference plan is reasonable when it provides an effective remedy for past discrimination without unnecessarily trammeling the interests of [majority competitors].

608 F.2d at 696. We believe the Ohio MBE plan satisfies this test. It does not cast an undue burden on non-minority contractors.

### B.

The district court found that the Ohio MBE act permits "unjust participation," that is, participation by members of minority groups who have suffered no economic disadvantages on account of race. The plaintiffs complain that all the information considered by the General Assembly related

to discrimination against blacks, but the act is "overinclusive" because it includes Hispanic, Oriental and American Indian enterprises for preferential treatment. These arguments overlook several facts. The decision of the Court of Common Pleas of Franklin County referred to earlier found discrimination against "minority," not just "black" businesses. The minorities selected by the Ohio legislature were the same ones often identified by Congress as disadvantaged. *E.g.* § 103(f)(2) of the Public Works Employment Act of 1977, 42 U.S.C. § 6705(f)(2) (1976 ed., Supp. II) (the *Fullilove* statute). The Ohio MBE act has a certification process which provides protection against participation by sham minority-front organizations. Only an enterprise which is owned or controlled by members of a designated minority at the time of certification and has been so owned or controlled for at least one year prior to the award of a set-aside contract can participate in the Ohio program.

The Ohio MBE act does not permit unjust participation in its benefits. The fact that individual minority enterprises may not be able to establish that they have suffered economically from the past practices of discrimination is of no importance. The General Assembly had abundant evidence that members of the designated minority groups had suffered economically from racial discrimination in the state's contracting and procurement policies. As we wrote in *Young:*

> . . . it was error to require proof that the persons receiving the preferential treatment had been individually subjected to discrimination, for "it is enough that each recipient is within a general class of persons likely to have been the victims of discrimination." *Bakke, supra,* 438 U.S. at 363, 98 S.Ct. at 2786.

608 F.2d at 694.

### C.

■ The district court held that the General Assembly erred by not determining whether a less intrusive means would have been effective in achieving its remedial goals. We begin this discussion by noting that there is no requirement that the least restrictive means be chosen. *Fullilove,* 448 U.S. at 508, 100 S.Ct. at 2790 (Powell, J.) The General Assembly had evidence that earlier efforts to increase minority participation in state business by various methods short of those contained in the MBE act, such as "goals" set by executive orders and administrative regulations, had not been successful. It also had the example of the approach adopted by Congress in the 1977 law upheld in *Fullilove.* It chose to follow the path set by Congress. The use of a set-aside plan is not impermissibly intrusive or restrictive.

The plaintiffs argue that the MBE act is "inflexible" and contains fixed "*Bakke* -type" quotas.[3] This contention overlooks many provisions of the law which give it flexibility. In the first place, all set-aside requirements in the MBE act are to be met "approximately." There is a provision for waiver or modification of the set-aside requirements when it is shown that after good faith efforts they cannot be met on a particular contract. Further, the requirements for subcontracting may be smaller in a given case than the percentages indicated in the language of the statute. The amounts to be awarded to minority subcontractors are 5% and 7% of the contract, or the amount actually subcontracted, whichever is less. Finally, non-minority contractors are not excluded from participation in contracts set aside for award to minority contractors. They may participate by having up to 49% ownership or control of a minority establishment, by taking up to 50% participation in a joint venture with a minority contractor and by bidding successfully for subcontracts awarded by minority prime contractors.

The district court erred in holding the Ohio MBE act invalid for failure of the

---

**3.** Both the plaintiffs and the district court recite instances during the first year of operation under the Ohio MBE act where allegedly arbitrary allocations of set-asides were made. This lawsuit is an attack on facial constitutionality only. If it develops that the act is being unconstitutionally applied that will furnish the basis for a separate action.

General Assembly to adopt the least intrusive means of achieving its goals. The plan chosen by the state legislature was reasonably calculated to promote greater participation by minorities in business with the state and did not unduly limit the opportunities of non-minority businesses or hamper the ability of the state to carry on its governmental functions.

### D.

The district court held that the lack of a "durational limitation" in the Ohio MBE act was fatal. The plaintiffs echo this conclusion and point out that the Ohio MBE act contains no "sunset" provision and is "permanent legislation." In *Fullilove* both Chief Justice Burger (448 U.S. at 489, 100 S.Ct. at 2780) and Justice Powell (448 U.S. at 513, 100 S.Ct. at 2792) noted that the federal MBE provision was limited in duration. It is important to note the context in which Chief Justice Burger discussed durational limits in *Fullilove*. He concluded that miscarriages in the administration of the federal statute would not be irremediable because,

> [t]he MBE provision may be viewed as a pilot project appropriately limited in extent and duration, and subject to reassessment and reevaluation by the Congress prior to any extension or reenactment.

448 U.S. at 489, 100 S.Ct. at 2780. The Ohio act is subject to continuing reassessment and reevaluation. The record discloses that in 1981 the General Assembly passed legislation containing several amendments to the Ohio MBE act, restricting the set of businesses which could qualify for MBE set-asides, clarifying the subcontracting requirements and adding operational details to the waiver provisions.

■ The Ohio General Assembly is necessarily alert to the desires of a majority of the electorate. It is incredible that this popularly elected branch of government would permit the set-asides for minority contractors to continue beyond the time required to achieve the goal of an equal opportunity for minorities to share in the business of the state. The Ohio legislature has shown already that the MBE act is not something it enacted and then forgot about or assumed would require no further attention. So long as the necessity for reassessment and reevaluation of a race-conscious remedial measure is recognized we do not believe a provision ending the program on a given date is required.

### IV.

The district court did not reach the plaintiffs' claims that the Ohio MBE act violates Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. However, the plaintiffs have repeated their arguments on appeal and we will deal with them briefly. In both *Fullilove* and *Bakke* a plurality of the Court held that Title VI is not violated by an affirmative action provision which is constitutional. *See Fullilove*, 448 U.S. at 492, n. 77, 100 S.Ct. at 2781, n. 77 (Burger, Ch. J.); *Id.* at 517, n. 15, 100 S.Ct. at 2794, n. 15 (Powell, J.), and n. 1 (Marshall, J.); *Bakke*, 438 U.S. at 341, 98 S.Ct. at 2775 *et seq.* (Brennan, J.). In *Young* this court wrote, "while Title VI may prohibit acts of discrimination, it cannot be read to forbid remedies which are constitutionally required and unavoidably race-conscious." 608 F.2d at 691.

■ Both Title VI and § 1981 are congressional enactments designed to enforce the equal protection requirements of the Fourteenth Amendment. A remedy for past violations of the right to equal protection, if acceptable when measured by constitutional requirements, cannot be held invalid under either of these statutes. We again refer to our holding in *Young*:

> What the Constitution forbids generally, § 1981 forbids with some specificity. The constitutional genesis of § 1981 also means that what the Constitution permits, § 1981 must also permit. Because the Constitution not only permits but requires race-conscious action to remedy a constitutional violation, it was error to hold that § 1981 bars such action.

*Id.* at 692.

### CONCLUSION

■ This court is acutely aware of the sensitivity of race-conscious remedies.

They can never be used just to prefer one group over another, but are available to alleviate the results of invidious discrimination. The Ohio General Assembly identified the discriminatory practices in state contracting and noted the economic disadvantages these practices had visited upon minorities. The legislature was also aware of the ineffectiveness of earlier efforts to engage minorities in their proportionate share of business with the state. Following the lead of Congress the General Assembly adopted a plan of setting aside approximate percentages of designated types of state contracts for bidding by minority business enterprises. Though there are functional differences between the federal MBE provision and the Ohio act, we conclude that the Ohio MBE act is sufficiently narrow in scope to satisfy the constitutional requirements found controlling in *Fullilove.*

The judgment of the district court is reversed with directions that the complaint be dismissed.

ENGEL, Circuit Judge.

I respectfully dissent. I would affirm the judgment of the district court upon the narrow ground that Ohio's Minority Business Enterprise Act is fatally flawed by its failure to incorporate any durational limitations upon its operation. In its present form, this act presents a very real danger of fostering a dependency upon favoritism which is inimical to general principles of equality and, I believe, to the commands of the Equal Protection Clause. While *Bakke* and *Fullilove* clearly allow a certain amount of latitude in remedial plans, even at the expense of color-blind treatment, I do not believe they support legislation such as this, which contains no durational limitation.

Race-conscious remedies are extraordinary. The Supreme Court has approved them only when based on findings of constitutional or statutory violations. *Fullilove,* 448 U.S. at 497, 100 S.Ct. at 2784 (Powell, J.). Moreover, these racial classifications must be limited to redressing the effects of past illegal discrimination. To qualify as a constitutionally permissible means of amelio-

rating the effects of identified past discrimination, this type of remedy must be "reasonably necessary" or "substantially related to the achievement of its remedial purpose." *See Fullilove,* 448 U.S. at 515, 100 S.Ct. at 2793 (Powell, J.); *Fullilove,* 448 U.S. at 520, 100 S.Ct. at 2796 (Marshall, J.). An important factor in the "means" test is "the planned duration of the remedy." *See Fullilove,* 448 U.S. at 510, 100 S.Ct. at 2791 (Powell, J.). If an originally permissible race-conscious remedy continues to operate after fulfilling its objective of redressing past discrimination, it becomes an impermissible racial preference.

The Ohio MBE Act contains absolutely no durational limitation and thus threatens to outlive its legitimate purpose. This deficiency is aggravated by the General Assembly's failure to articulate the Act's objectives, thus making it difficult to determine when the objectives have been fulfilled.

In *Fullilove,* Chief Justice Burger noted generally that in adopting this type of race-conscious remedy, "Congress must proceed only with programs narrowly tailored to achieve its objectives, subject to continuing evaluation and reassessment; administration of the programs must be vigilant and flexible. . . ." 448 U.S. at 490, 100 S.Ct. at 2780 (Burger, C.J.). He also emphasized that that particular MBE provision "may be viewed as a pilot project, appropriately limited in extent and duration, and subject to reassessment and re-evaluation by the Congress prior to any extension or re-enactment." 448 U.S. at 489, 100 S.Ct. at 2780 (Burger, C.J.) (footnote omitted). Likewise, in *Fullilove,* Justice Powell noted that "[t]he temporary nature of [the § 103(f)(2) set-aside] ensures that a race-conscious program will not last longer than the discriminatory effects it is designed to eliminate." 448 U.S. at 513, 100 S.Ct. at 2792 (Powell, J.). *Detroit Police Officers' Association v. Young,* 608 F.2d 671 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), upon which the majority here places considerable reliance, similarly emphasizes the necessity of durational limitations in its concluding paragraph:

In the event the district court concludes that the affirmative action plan may remain in force, it will be necessary to determine a formula for its eventual termination. In approving the plan in *Weber,* the Supreme Court noted that it was a temporary measure to eliminate a manifest racial imbalance, not a measure to maintain a given balance. *Steelworkers v. Weber, supra,* 443 U.S. 193, 99 S.Ct. 2721 [61 L.Ed.2d 480]. Unless the parties are able to agree on provisions for termination of the plan in event of its approval, this will be an ingredient of the final judgment.

608 F.2d at 697–98.

I do not view this requirement as an incidental concern. I am unable to agree with the majority that the absence of any durational limits may be safely overlooked because it is "incredible" that a popularly elected legislature would suffer the continuance of such a law beyond the period of constitutional need. On the contrary, I find it entirely credible that such a law may remain in force well beyond the elimination of discriminatory effects. It is precisely this danger which has occasioned such emphasis in the courts upon some distinct termination or "sunset" provision.

I agree with the majority that Equal Protection imposes an obligation of self-correction upon the states as well as upon the federal government. It is also unrealistic to expect that the states will buttress their legislation with the sophisticated legislative history which Congress is capable of producing in support of federal legislation. While I therefore tend to agree with the majority that the district court may have taken "too restrictive a view" of the facts surrounding enactment of the Ohio MBE Act, it must certainly be observed that the legislature apparently took great pains to avoid any direct determination that there had been actual past discrimination against minority business enterprises justifying the Act's set-aside provisions. The majority opinion acknowledges as much in its observation that "the Act did not contain a preamble which stated in so many words

that its purpose was to correct past practices by which the state was involved in discrimination against minority contractors." *Ante* p. 6. As pointed out by Judge Kinneary in the district court, the finally enacted bill did contain a preamble:

Amended Substitute House Bill 584, commonly known as the Minority Business Enterprise Act [the "Act"], was enacted by the General Assembly and signed into law in December of 1980. As set forth in its preamble, the Act amended several sections of the Ohio Revised Code and created several new sections in order to

"establish a minority business development loan program, to provide construction contracts bonds for minority businesses unable to obtain them from private sources, to set aside 5% of state construction contracts and 15% of state procurement contracts for minority businesses, to require a portion of every state construction contract to be reserved for minority subcontractors and materialmen, [and] to require all state and local procurement contracts to contain anti-discrimination clauses...."

Preamble, Am.Sub.H.B. 584 (Defendants' Exhibit No. 127). Plaintiffs do not challenge the portions of this comprehensive scheme that deal with the minority business loan and bonding programs, but do challenge those portions of the Act, as amended, that mandate the set-aside of contracts for minority participation only. Thus the General Assembly had the opportunity to make findings of past discrimination, but failed to do so. The only statement of purpose in the Act is found in Ohio Rev.Code Ann. § 122.73 (Baldwin), which describes the Ohio development financing commission's powers under the Act and establishes the minority development financing advisory board:

The Ohio development financing commission is invested with the powers and duties provided in sections 122.71 to 122.-85 of the Revised Code, in order to promote the welfare of the people of the state by encouraging the establishment

and expansion of minority business enterprises, to stabilize the economy, to provide employment, to assist in the development within the state of industrial, commercial, distribution, and research activities required for the people of the state, and for their gainful employment, or otherwise to create or preserve jobs and employment opportunities, or improve the economic welfare of the people of the state. It is hereby determined that the accomplishment of those purposes is essential so that the people of the state may maintain their present high standards of living in comparison with the people of other states and so that opportunities for employment and for favorable markets for the products of the state's natural resources, agriculture, and manufacturing shall be improved and that it is necessary for the state to establish the minority development financing advisory board and invest it and the Ohio development financing commission with the powers and duties provided in sections 122.71 to 122.85 of the Revised Code.

Once more, Senator William S. Bowen, Chairman of the Senate Commerce and Labor Committee, who had earlier introduced in the Ohio Senate a bill containing the set-aside provisions which were ultimately adopted, avoided any suggestion of past discriminatory practices.

Judge Kinneary's opinion further reports:

Am.Sub.H.B. 584 was brought to the floor of the Senate for approval on November 24, 1980. Senator Bowen, as Chairman of the reporting committee and chief sponsor of the set-aside amendments, introduced and spoke in favor of the bill. He restated the purposes of the bill as follows:

"Amended substitute House Bill 584 codifies into permanent law a purpose clause indicating that the Ohio development financing commission is invested with the powers given to it by the bill in order to promote the public welfare by encouraging the establishment and expansion of minority business enterprises, to establish the economy, to assist in industrial/commercial distribu-tion and research development, to create and preserve jobs, and to improve the economic welfare of Ohioans.

These purposes are deemed essential to the maintenance of Ohioans' favorable standard of living as compared to persons in surrounding states, and so that employment opportunities in the marketing of Ohio products would be enhanced."

Transcript of Proceedings before the Ohio Senate, November 24, 1980 (Defendants' Exhibit No. 128), pp. 13–14. Senator Bowen went on to describe briefly how the set-aside provisions would operate, *id.* at 18, but did not state what their purpose was, if different from the general purposes he had outlined earlier. He stated: "The committee had several hearings on the bill. We have heard similar measures relative to MBE's relative to bonding, relative to set-aside. I don't think it pertinent that I elaborate or dwell on the merits of the bill. I think the component parts are understood." *Id.* at 20.

What is significant in these statements and many others relied upon by Judge Kinneary, is not the presence of a socially desirable purpose, which these comments laudably reflect, but the absence of the kind of finding which bespeaks compelling necessity and hence a constitutional justification for departing from normal concepts of equal protection.

While I would be reluctant to strike down the Act on this basis alone, I seriously question whether the Supreme Court majority which upheld the findings in *Fullilove* would accept the very minimal legislative history here. When this deficiency is combined with the absence of any temporal limitations, it is simply impossible to determine when the legislative objective has been accomplished.

Finally, I am convinced that the majority, by suggesting in Part C that section 5 of the Fourteenth Amendment is merely "enabling" legislation without which Congress would have no explicit authority to enforce

the equal protection clause against a state, underreads the emphasis which Chief Justice Burger and Justice Powell place in *Fullilove* upon the unique role expressly created for the Congress by the General Welfare Clause and the Commerce Clause, as well as section 5 of the Fourteenth Amendment. 448 U.S. at 473–78; 499–502, 100 S.Ct. at 2772–74; 2785–2787. In my opinion, that emphasis was made not because the Court was concerned with the power of Congress to act generally, but because it was concerned with the radical nature of the remedy Congress had prescribed. As Justice Powell observed:

> Racial preference never can constitute a compelling state interest. " 'Distinctions between citizens solely because of their ancestry' [are] 'odious to a free people whose institutions are founded upon the doctrine of equality.' " *Loving v. Virginia, supra* [388 U.S. 1] at 11 [87 S.Ct. 1817 at 1823, 18 L.Ed.2d 1010] quoting *Hirabayashi v. United States,* 320 U.S. 81, 100 [63 S.Ct. 1375, 1385, 87 L.Ed. 1774] (1943). Thus, if the set-aside merely expresses a congressional desire to prefer one racial or ethnic group over another, § 103(f)(2) violates the equal protection component in the Due Process Clause of the Fifth Amendment. See *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

*Fullilove,* 448 U.S. at 497, 100 S.Ct. at 2784 (Powell, J.). Similarly a mere desire to promote the interests of minority contractors in Ohio can never constitute a state interest sufficient to justify the set-aside provisions of Ohio's MBE Act, and yet that represents the only clearly articulated justification offered by the Ohio General Assembly. Proper respect for the motives of the General Assembly might justify our assuming the proper motive of eradicating past discrimination, but when this uncertainty is added to the total absence of any termination date or any objective standard for determining it, the result, in my opinion, is nothing more than an uncontrolled expression of impermissible racial preference.