779 F.2d 181
 38 Empl. Prac. Dec. P 35,760, 54 USLW 2356,
33 Cont.Cas.Fed. (CCH) 74,135
 J.A. CROSON COMPANY, Appellant,
v.
CITY OF RICHMOND, Appellee.
Associated General Contractors of America, Amicus Curiae.
J.A. CROSON COMPANY, Appellee,
v.
CITY OF RICHMOND, Appellant.
Associated General Contractors of America, Amicus Curiae.
 Nos. 85-1002(L), 85-1041.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 17, 1985.
Decided Nov. 25, 1985.
 
 Walter H. Ryland (Williams, Mullen & Christian, Richmond, Va., on brief), for appellant/cross-appellee.
 Reginald M. Barley, Sr. Asst. City Atty. (Michael L. Sarahan, Asst. City Atty., Richmond, Va., on brief) for appellee/cross-appellant.
 Michael E. Kennedy, Washington, D.C., for amicus curiae.
 Before HALL, SPROUSE, and WILKINSON, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 In its action in the district court for an injunction, declaratory relief and damages, J.A. Croson Company (Croson), challenged the Minority Business Utilization Plan of the City of Richmond.[1] The court ruled in favor of the City declaring the Plan valid and Croson brought this appeal.[2] The City of Richmond appeals the district court's denial of its motion for attorneys' fees. We affirm the district court's judgment in its entirety.
 
 I.
 
 2
 The dispute arose from the application of Richmond's Minority Business Utilization Plan (the Plan) to Croson's bid on a proposed city contract to install plumbing fixtures at the City Jail. Croson, an Ohio mechanical, plumbing, and heating contractor with a Richmond branch, was the only bidder, but City officials refused to award it the contract since it did not obtain the services of a minority subcontractor as required by the Plan. After the City nullified Croson's bid and reopened the bidding, Croson filed this action for injunction, declaratory relief, and damages. It asked primarily that the Plan be declared void under Virginia statutory and constitutional law as well as under the fourteenth amendment to the United States Constitution. The trial court denied cross-motions for summary judgment, and after a bench trial ruled that the Plan was valid.
 
 II.
 
 3
 The Richmond Council adopted the Plan on April 11, 1983. Richmond Va.Code Ch. 24.1, Art. I(F) (Part B) (27.10) (27.20) and Art. VIII-A. It acted in response to information presented at a public hearing held that day which, among other things, indicated that, although minority groups made up 50% of the City's population, only 0.67% of the city's construction contracts for the five-year period from 1978-1983 were awarded to minority businesses. Simply stated, the Plan requires all contractors to whom the city awards construction contracts to subcontract at least 30% of the dollar amount of the contract to minority business enterprises (MBEs) unless the requirement is waived. Richmond, Va.Code Ch. 24.1, Art. VIII-A(A), (B).[3] The Plan is expressly remedial in nature and was "enacted for the purpose of promoting wider participation by minority business enterprises in the construction of public projects." Richmond, Va.Code Ch. 24.1, Art. VIII-A(C). It automatically expires on June 30, 1988, approximately five years after its effective date. Id.
 
 
 4
 Five months after enacting the Plan, the City issued an invitation to bid on the contract for the installation of plumbing fixtures at the City Jail involved in this dispute. The specifications defined fixtures manufactured by either Acorn Engineering Company or Bradley Manufacturing Company as suitable for the project. Croson, a non-MBE plumbing contractor, received the bid documents on September 30, 1983 and submitted its bid on October 12. After receiving the documents, Eugene Bonn, Croson's regional manager in Richmond, determined that the 30% MBE requirement on this project could only be met if an MBE was utilized as a supplier furnishing either the Acorn or Bradley plumbing fixtures.
 
 
 5
 Bonn telephoned either five or six MBEs on September 30 to obtain quotes on the fixtures.[4] There is a dispute as to the date Bonn first contacted Continental Metal Hose, the only one of these MBEs located in Richmond. Bonn testified that he contacted Melvin Brown, the president of Continental, on September 30. Brown, however, claimed that he was not contacted until October 12, 1983--the last day on which bids could be submitted.
 
 
 6
 On the morning of October 12, Bonn made a second brief round of telephone calls to MBEs, including a call to Brown of Continental. Brown informed him that Continental wished to participate in the project. Brown then contacted two sources of Bradley fixtures, Ferguson Plumbing Supply and W.G. Leseman. Ferguson informed Brown that the company had already provided a direct quote to Croson for the fixtures and consequently would not provide a quote to Brown. Leseman told Brown that it was not allowed to quote to unknown suppliers until the supplier had undergone a credit investigation taking at least thirty days.
 
 
 7
 On October 13, City officials opened the sealed bids, which revealed Croson as the only bidder. Its bid of $126,530 included a quote from a non-minority firm for the plumbing fixtures. That same day, Brown had detailed to Bonn his problems in obtaining a quote for the required fixtures, but Bonn encouraged him to continue his efforts. Although aware of Brown's continuing interest in supplying the fixtures, Bonn submitted a request for waiver of the 30% MBE requirement to the City on October 19, 1983. In his waiver request, Bonn indicated that Continental was "unqualified" and that the other MBEs contacted were either "non-responsive" or "unable to quote."
 
 
 8
 On October 27, 1983, Brown learned of Croson's request for waiver and telephoned an agent of Acorn, one of the two fixture manufacturers named in the bid specifications. The agent provided Brown with a quote on October 31, which Brown supplied to Bonn shortly thereafter.
 
 
 9
 Brown also informed the Director of Purchasing for the Department of General Services on October 27 that Continental could provide the required fixtures. Subsequently, the contract officer responsible for ruling on Croson's waiver request recommended that the request be disapproved because an MBE was available.
 
 
 10
 The City, by letter dated November 2, 1983, informed Croson that the Human Relations Commission had "withheld approval" of the waiver request. Croson was given ten days to submit a completed Commitment Form evidencing his compliance with the minority set-aside provision. He was advised that if he failed to submit the Form his bid would be considered non-responsive.
 
 
 11
 Rather than supplying a completed Commitment Form, Bonn again requested a waiver on November 8, 1983. He argued that Continental was not qualified; that its quotation was substantially higher than any other quotation and was submitted twenty-one days after the bid date. Eight days later, Bonn documented the additional costs that would result should Continental provide the fixtures. He concluded that, if he were required to subcontract with Continental, the contract price must be increased by $7,663.16. The Department of General Services denied Croson's request to raise the contract price, as well as its renewed request for a waiver. On November 18, the City informed Croson by letter that it had decided to rebid the project and invited Croson to submit a new bid.
 
 
 12
 Three weeks later, Croson wrote to the Department of General Services requesting a review. The City rejected the request for review on the ground that the decision to rebid the project was not appealable.[5] Croson then filed this suit.
 
 
 13
 The district court in a well-written decision made comprehensive findings, reviewed both Virginia and Federal law and concluded that the Plan was valid. Croson does not pursue all of the arguments it raised below, but on this appeal, as at trial, it argues that: (1) under state law the City was without power to adopt the Plan, (2) the Plan is contrary to the public policy of Virginia, (3) the Plan violates the Virginia constitutional proscription against discrimination on the basis of race, color, or national origin, Va. Const. Art. I, Sec. 11, and (4) the Plan violates the equal protection clause of the fourteenth amendment of the federal Constitution.
 
 
 14
 Affirmative action legislation creating minority set-aside plans and designed to ameliorate the effects of past discrimination in public construction contracts have been tested and approved in a number of state and federal decisions. Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); South Florida Chapter of the Associated Gen. Contractors of America, Inc. v. Metropolitan Dade County, Florida, 723 F.2d 846 (11th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); Ohio Contractors Ass'n v. Keip, 713 F.2d 167 (6th Cir.1983); Schmidt v. Oakland Unified School Dist., 662 F.2d 550 (9th Cir.1981), vacated on other grounds, 457 U.S. 594, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982); Southwest Washington Chapter, Nat'l Elec. Contractors Ass'n. v. Pierce County, 100 Wash.2d 109, 667 P.2d 1092 (1983); contra Arrington v. Associated Gen. Contractors of America, 403 So.2d 893 (Ala.1981), cert. denied, 455 U.S. 913, 102 S.Ct. 1265, 71 L.Ed.2d 453 (1982). Because set-asides may be constitutionally permissible but are not constitutionally mandated, state and local programs must, of course, be permitted under state law. South Florida, 723 F.2d at 852; Schmidt, 662 F.2d at 558; Southwest Washington Chapter, 667 P.2d at 1100. We look first then to the issues of Virginia law raised by Croson both as they relate to pendent questions and as critical components of the test derived from Fullilove. We then examine the Richmond Plan under the Fullilove standards to determine if it survives scrutiny under the equal protection clause of the fourteenth amendment.
 
 III.
 
 15
 Croson contends that the City of Richmond had no power to enact the plan--that it was ultra vires. It urges that the scope of a local government's authority in Virginia is determined by Virginia's rule of law known as the "Dillon Rule," and that the contested ordinance is not within the purview of that rule. This principle of law is that "local governing bodies have only those powers that are expressly granted, those that are necessarily or fairly implied from expressly granted powers, and those that are essential and indispensable." Tabler v. Bd. of Supervisors of Fairfax County, 221 Va. 200, 292, 269 S.E.2d 358, 359 (1980). It is agreed that Virginia has not expressly authorized cities to adopt procurement set-aside programs for minorities. The validity of the ordinance, therefore, depends on whether it is authorized under one of the other two prongs of the Dillon Rule.
 
 
 16
 The Virginia Public Procurement Act, Va.Code Secs. 11-35 to 11-80 (Supp.1984), details complete procurement procedures for public bodies subject to its requirements. The first section of this chapter--section 11-35 explains its purpose and applicability. Under this provision a city which adopts its own procurement policies is exempt from the state scheme provided the city's plan is based on competitive principles. Municipalities may devise local procurement programs when
 
 
 17
 ... (the) governing body adopts by ordinance or resolution alternative policies and procedures which are based on competitive principles and which are generally applicable to procurement of goods and services by such governing body and the agencies thereof.
 
 
 18
 Va.Code Sec. 11-35(D) (Supp.1984).
 
 
 19
 The Richmond Business Minority Utilization Plan is not an isolated ordinance. The Council enacted the ordinance creating the Richmond procurement system on December 20, 1982.[6] It added the "Plan" by an amendment to the procurement system on April 11, 1983.[7] The City states that it derives its authority to enact both the general procurement ordinance and the Plan portion of it from section 11-35(D) of the state law. It argues that since its "set aside" ordinance fosters competition, the authority to enact it is implied in section 11-35(D). Croson does not argue that the City's basic procurement ordinance is invalid. It contends, however, that the Plan is not "based on competitive principles" and that it is contrary to the public policy of Virginia.
 
 
 20
 We think Croson's first contention ignores the continuing anti-competitive effects of past discrimination. The Richmond City Council had before it an empirical study that, while one-half of the City's population were members of minority groups, minority-owned business enterprises received virtually none of the city contracts awarded during the five year period 1978-1983. By encouraging minority-owned businesses to enter an area of economic activity where they have previously been absent, the Plan will very likely increase competition as MBEs and teams of MBEs and non-MBEs vie for public contracts. Furthermore, the Plan does not alter the fundamental competitiveness of the bidding process; even under the City's ordinance, the City will award contracts to the "lowest responsive and responsible bidder." Richmond, Va.Code Ch. 24.1, Article IV, Sec. 14(a). Accordingly, we agree with the City and Judge Merhige that the Plan is "based on competitive principles" and therefore that the authority for the adoption of the set-aside Plan is "fairly implied" from the power expressly granted to Richmond to develop its own procurement procedures under section 11-35(D) of the Virginia Public Procurement Act.
 
 
 21
 Croson bases its second argument that the Plan is contrary to public policy and therefore invalid on section 11-44 which provides:
 
 
 22
 In the solicitation or awarding of contracts, no public body shall discriminate because of the race, religion, color, sex, or national origin of the bidder or offeror.
 
 
 23
 We agree with the district court that the Plan is not contrary to the public policy of Virginia expressed in Code section 11-44. In the first place, as we have held, the City's Plan is specifically exempted from this and other requirements of the state procurement scheme[8] by section 11-35(D) since it is adopted by an ordinance "based on competitive principles." The exemption, however, is not necessary to refute the assertion that the Plan is contrary to public policy. Croson ignores the policy implications of section 11-48, which is devoted to encouraging the participation of minority businesses in the performance of public contracting. Section 11-48 provides:
 
 
 24
 All public bodies shall establish programs consistent with all the provisions of this chapter to facilitate the participation of small businesses and businesses owned by women and minorities in procurement transactions ... State agencies shall submit annual progress reports on minority business procurement to the State Office of Minority Business Enterprise.
 
 
 25
 Further, at the time sections 11-44 and 11-48 were enacted by the Virginia legislature, it was well established that federal statutes prohibiting racial discrimination do not necessarily prohibit race-conscious programs designed to remedy the effects of historical racial discrimination. As the district court said:
 
 
 26
 Plaintiffs fail to recognize that the word "discriminate" is not self-defining, especially in the context of legislation addressing race relations. In that context, the word does not necessarily proscribe programs that create preferences for blacks and other groups that have historically been the victims of discrimination. See, e.g., United Steelworkers of America v. Weber, 443 U.S. 193, 201-08 [99 S.Ct. 2721, 2726-30, 61 L.Ed.2d 480] (1979).
 
 
 27
 Croson v. Richmond, No. 84-0021-R, Slip op. at 19, (E.D.Va. December 3, 1984).
 
 
 28
 Croson asserts, however, that even if the Virginia legislature implicitly intended to authorize minority set-aside programs such as the Richmond Plan, these programs violate Article I, Section 11 of the Virginia Constitution. This Virginia Constitutional article states that "the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged." Croson argues that in testing the Plan under this article, the Virginia Supreme Court would apply the strict scrutiny standard because the Plan promotes discrimination based on race. See Duke v. County of Pulaski, 219 Va. 428, 432-33, 247 S.E.2d 824 (1978).
 
 
 29
 As the parties conceded below, however, the Virginia Supreme Court has interpreted Article I, section 11 "[to be] no broader than the equal protection clause of the Fourteenth Amendment to the Constitution of the United States." Archer v. Mayes, 213 Va. 633, 638, 194 S.E.2d 707, 711 (1973). See also Schilling v. Bedford Cty. Memorial Hosp., 255 Va. 539, 303 S.E.2d 905, 907 n. 2 (1983). Croson also argues that the Plan violates the equal protection clause of the United States Constitution's fourteenth amendment. Not only does the resolution of that fourteenth amendment issue answer the argument based on the Virginia Constitution, but it is the principal issue in this appeal.
 
 IV.
 
 30
 The Supreme Court in Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) upheld a minority set aside plan which had been attacked as violative of the equal protection clause of the fourteenth amendment. In the past five years, several circuit courts of appeal as well as state supreme courts have followed and amplified the various rationale of the Court's opinions in Fullilove. South Florida, 23 F.2d 846; Ohio Contractors, 713 F.2d 167; Schmidt, 662 F.2d 550; Southwest Washington Chapter, 667 P.2d 1092; contra Arrington, 403 So.2d 893. Although the Constitution does not require such affirmative action plans to rectify past discrimination, there is now no question but that constitutionally they may be imposed. There is also little question but that such plans may be implemented by states or their political subdivisions as well as by Congress or private entities. See United Steelworkers of America v. Weber, 443 U.S. 193, 197, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979); South Florida, 723 F.2d at 852; Ohio Contractors, 713 F.2d at 172; Schmidt, 662 F.2d at 557. Our chore, then, is relatively straight-forward--we must determine simply if the Richmond City Plan fits the constitutional mold shaped by the Supreme Court in Fullilove.
 
 
 31
 In Fullilove, the Supreme Court upheld the 10% set-aside provision of the federal Public Works Employment Act, ("PWEA") 42 U.S.C. Sec. 6705(f)(2) (1982). That provision required state and local governments applying for federal grants for public works projects to provide assurances that at least 10% of the grant would be expended through minority business enterprises. The statute provided for administrative waivers of the 10% requirement in some instances. While no single standard of analysis for minority set aside programs emerged from the Court's several opinions, the opinions authored by the Chief Justice and by Justice Powell, particularly, have provided the basis for development of standards for judicial review of the set-aside plans. The Chief Justice, writing for himself and Justices Powell and White, employed a three-part standard, examining the statute in order to determine whether (1) the purpose of the program was remedial, i.e. designed to eliminate practices that might serve to perpetuate the effects of prior discrimination, (2) the objective was within Congress' authority, and (3) the means employed were "narrowly tailored" to achieve the remedial goal. 448 U.S. at 473, 490, 100 S.Ct. at 2772, 2780.
 
 
 32
 In a concurring opinion, Justice Powell, invoking, as the Chief Justice had not, the traditional strict scrutiny standard, examined the basis of Congress' authority to adopt the program and inquired whether the racial classification served a "compelling" state interest. According to Justice Powell, the interest could not be found to be compelling unless it satisfied a two-part test:
 
 
 33
 (1) The governmental body that attempts to impose a race-conscious remedy must have the authority to act in response to identified discrimination; and
 
 
 34
 (2) The governmental body must make findings that demonstrate the existence of illegal discrimination.
 
 
 35
 Fullilove, 448 U.S. 498, 100 S.Ct. at 2785. Even if the government has proffered a compelling state interest, the court must then determine that the means selected by the governmental body is narrowly drawn to fulfill the governmental purpose. Id. See also South Florida, 723 F.2d at 851-52. In his analysis, Justice Powell noted the factors which various Courts of Appeals had used in reviewing remedial hiring programs; he then utilized these factors in analyzing the Congressional program aimed at assisting minority contractors. These factors included (1) the efficacy of alternative remedies, (2) the planned duration of the plan, (3) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force, (4) the availability of waiver provisions if the hiring plan could not be met, and (5) the effect of the set-aside plan on innocent third parties. Fullilove, 448 U.S. at 510-11, 514-15, 100 S.Ct. at 2791-92, 2793-94.
 
 
 36
 The concurring opinion of Justice Marshall and two other justices stated that an intermediate level of scrutiny should govern review of minority set-aside programs and such programs are constitutionally valid as long as the means chosen are "substantially related" to the avowed remedial purpose. Id. at 519, 100 S.Ct. at 2796.
 
 
 37
 The district court in this case recognized the Supreme Court's internal disagreement as to the proper analysis for minority set-aside programs and adopted the approach employed by the Eleventh Circuit in South Florida, 723 F.2d at 851-52, as a proper synthesis of the various Fullilove concerns. This test requires that for a minority set-aside plan to be constitutional:
 
 
 38
 (1) [that] the governmental body have the authority to pass such legislation; (2) [that] adequate findings have been made to ensure that the governmental body is remedying the present effects of past discrimination rather than advancing one racial or ethnic group's interests over another; (3) [that] the use of such classifications extend no further than the established need of remedying the effects of past discrimination.
 
 
 39
 723 F.2d at 851-52.
 
 
 40
 We agree with the Eleventh Circuit and the district court that this test sufficiently captures the common concerns articulated by the various Supreme Court opinions to provide a general guideline for judging the constitutionality of a set-aside plan.
 
 
 41
 (a)
 
 
 42
 As we have noted, supra, there is little doubt that state political subdivisions, if authorized by state law, generally have authority under the United States Constitution to enact minority set-aside programs. See South Florida, 723 F.2d at 852; Ohio Contractors, 713 F.2d at 172. We held in part III of this opinion that the city's authority emanated from the Virginia Legislature. No prolonged discussion then, is needed to demonstrate the Plan's compliance with the first prong of the South Florida test.
 
 
 43
 (b)
 
 
 44
 The second requirement of the synthesized Fullilove test is that the governmental body adopting a remedial plan make adequate findings to ensure that it is remedying the present effects of prior discrimination rather than advancing one racial group's interest over another. In reviewing the findings of the Richmond City Council to determine if they satisfy this aspect of the constitutional test, we must maintain the proper perspective of our appellate task. We review not the findings of fact which underly a judicial decision but those of a legislative branch of government (here a division of state government) to determine if it has carried out its function in a constitutionally acceptable manner. Our review would be more intrusive into the fact-finding process and the limitations we impose on the finders of fact would be stricter if we were reviewing a judicially created remedy. The opinions of the Fullilove Court emphasize the fundamental difference between appellate review of judicially created remedies and legislatively created ones. In his detailed presentation of the background to the congressional findings in the public works set-aside provision, the Chief Justice underscored the broad scope of the fact-finding authority of Congress. Fullilove, 448 U.S. at 483-84, 100 S.Ct. at 2777-78. Justice Powell, writing at length to distinguish the standard for reviewing legislative findings from the normal standard of review of judicial findings, stated:
 
 
 45
 Congress is not an adjudicatory body called upon to resolve specific disputes between competing adversaries. Its constitutional role is to be representative rather than impartial, to make policy rather than to apply settled principles of law. The petitioners' contention that this Court should treat the debates on Sec. 103(f)(2) as the complete "record" of congressional decisionmaking underlying that statute is essentially a plea that we treat Congress as if it were a lower federal court. But Congress is not expected to act as though it were duty bound to find facts and make conclusions of law.
 
 
 46
 * * *
 
 
 47
 Acceptance of petitioners' argument would force Congress to make specific factual findings with respect to each legislative action. Such a requirement would mark an unprecedented imposition of adjudicatory procedures upon a coordinate branch of Government. Neither the Constitution nor our democratic tradition warrants such a constraint on the legislative process. I therefore conclude that we are not confined in this case to an examination of the legislative history of Sec. 103(f)(2) alone. Rather, we properly may examine the total contemporary record of congressional action dealing with the problems of racial discrimination against minority business enterprises.
 
 
 48
 Id. at 502-503, 100 S.Ct. at 2787.
 
 
 49
 The Chief Justice reviewed in great detail "the total contemporary record of congressional action dealing with the problem of racial discrimination." Id. at 463-67, 100 S.Ct. at 2767-69. He noted the ongoing effort by the national government through such agencies as the Small Business Administration and the Office of Minority Business Enterprise to remedy the effects of past discrimination.[9] Id. Having reviewed the breadth of congressional fact-finding in this area, the Court accepted the assertion that discrimination in the construction industry against minorities has been prevalent in this country and has seriously limited the opportunity of minorities to participate in government contracting. Id. at 461-67, 100 S.Ct. at 2766-69. Furthermore, it was not the first such recognition by the Supreme Court of the effect of discrimination on minority participation in the construction industry. In Weber, Justice Brennan noted that "[j]udicial findings of exclusions from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice." 443 U.S. at 198, n. 1, 99 S.Ct. at 2725, n. 1.
 
 
 50
 The extensive references in the Chief Justice's and Justice Powell's opinions to Congressional power to deal with past discrimination, however, do not imply that state legislative bodies are powerless to act to remedy past discrimination. South Florida, 723 F.2d at 852, Ohio Contractors, 713 F.2d at 172. As the Eleventh Circuit wrote in South Florida, "although the scope of Congress' power to remedy such discrimination may be greater than that of the states, state legislative bodies are not without authority to ensure equal protection...." 723 F.2d at 852.[10] The legislative body of the City of Richmond, acting under authority of state law, undertook an approach similar to that which Congress took in enacting the minority set-aside in the local public works program. Acting at the local level, the city council in a public legislative session reviewed the history of public procurement in Richmond with the goal of ensuring that public funds would be spent in a nondiscriminatory manner consistent with competitive practices.
 
 
 51
 Congressional findings of discrimination on a national scale would not alone justify a city legislative finding of past racial discrimination in public contracting in the City of Richmond. They are, however, relevant to the extent that the Richmond City Council determined that the City's record has been and was, in fact, a part of the national problem. The council debate preceding the enactment of the ordinance creating the Plan demonstrates that the council was aware of the background of the nationwide remedial programs. Proponents pointedly referred to the national background and, importantly, asserted that such discrimination existed in Richmond--a fact not denied by opposing witnesses nor opponents within the council. The council and witnesses, both for and against the Plan,[11] had available complete historical records of city contracting and specifically a statistical study showing that minorities, who constituted 50% of the City's population, had received over a five-year period only 0.67% of the City's contracting business. The debate in council was sharply joined, and there can be no doubt that the legislative issue was well defined. The vote adopting the Plan was not unanimous--six voted for it--three against it.
 
 
 52
 Unlike the review we make of a lower court decision, our task is not to determine if there was sufficient evidence to sustain the council majority's position in any traditional sense of weighing evidence. Rather, it is to determine whether "the legislative history ... demonstrates that [the council] reasonably concluded that ... private and governmental discrimination had contributed to the negligible percentage of public contracts awarded minority contractors." Fullilove, 448 U.S. at 503, 100 S.Ct. at 2787, (Powell, J. concurring). Considering the total information available to the council, we think its conclusion was reasonable.[12] In short, in our view, the information considered by the Richmond City Council, gathered and demonstrated through the public hearing and study, was adequate to ensure that the Plan was adopted to remedy the effect of past discrimination rather than advancing one group's interest over another.[13]
 
 
 53
 (c)
 
 
 54
 The third prong of the Fullilove test is that the program extend no further than the established need of remedying the effects of past discrimination. In applying the third prong, we evaluate the Plan in light of the requirement set forth in the Chief Justice's opinion in Fullilove that the remedy be narrowly tailored to the legislative goals of the Plan. 448 U.S. at 490, 100 S.Ct. at 2780. We also consider a number of factors identified by Justice Powell in his concurring opinion in Fullilove, such as duration, availability of waiver provisions, relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force, and the effect on innocent third parties. Id. at 510-11, 514, 100 S.Ct. at 2791-92, 2793.
 
 
 55
 Croson contends that, even if there were sufficient evidence of past discrimination to justify a remedial plan, the Plan is an overextensive response, not narrowly tailored to accomplish the intended remedial purposes. It argues principally that (1) the 30% set-aside figure is unreasonable, and (2) the Plan lacks an effective waiver provision to protect it against abuses. The district court exhaustively analyzed these arguments and concluded that the Plan was valid, and we agree.
 
 
 56
 Croson asserts that the district court erred in its assessment of the reasonableness of the 30% set-aside requirement by not comparing the 30% figure to the percentage of MBEs in the area. We disagree. Although there are currently few MBEs in the Richmond area, we think the establishment of a 30% set-aside requirement for a five-year period, with adequate waiver provisions, is reasonable in light of the undisputed fact that minorities constitute 50% of the population of Richmond.[14] A set-aside limited to the current percentage of minority contractors would offer no remedy to eliminate the continuing consequences of the discrimination which has resulted in the present low level of minority participation in government contracting. In remedying the effects of past discrimination, a set-aside program for a period of five years obviously must require more than a 0.67% set-aside to encourage minorities to enter the contracting industry and to allow existing minority contractors to grow. See Fullilove, 448 U.S. at 513-14, 100 S.Ct. at 2793-94 (Powell, J., concurring) (10% set-aside reasonable, where 17% of the population and only 4% of the contractors were minority group members); Southwest Washington Chapter, 667 P.2d at 1101 (MBE participation goal of 11% set at slightly less than county's minority population held reasonable); Schmidt, 662 F.2d at 559, vacated on other grounds, 457 U.S. 594, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982), (25% goal reasonable in light of city's 34.5% non-white population; decision vacated for failure to reach merits of state statutory issue prior to deciding constitutional claim). Common sense dictates that judging the set-aside percentage by reference to the existing small proportion of MBEs in the economy would tend to perpetuate rather than alleviate past discrimination. Such a standard would thwart the Plan's remedial purpose of encouraging the development of minority-owned businesses by providing ample opportunity for MBEs to obtain construction contracts. As Justice Powell noted, the Supreme Court "has not required remedial plans to be limited to the least restrictive means of implementation." Fullilove, 448 U.S. at 508, 100 S.Ct. at 2790.
 
 
 57
 Both the Chief Justice and Justice Powell in Fullilove emphasized the importance of waiver provisions in minority set-aside plans. 448 U.S. at 487-89, 514, 100 S.Ct. at 2779-80, 2793. The Chief Justice recognized that in certain market areas, grantees would be unable to meet the 10% requirement despite their best efforts. Id. at 488, 100 S.Ct. at 2780. The Court was also sensitive to the possibility that minority set-asides might prove counterproductive--that rather than rectifying the effects of past discrimination, they might allow MBEs to exploit the remedial aspect of the program by charging unreasonable prices or enable sham minority companies to gain competitive advantages. Id. at 487-88, 100 S.Ct. at 2779-80. Courts of appeals responding to Fullilove have also recognized the importance of adequate safeguards designed to avoid future favoritism based on race. See South Florida, 723 F.2d at 853-54; Ohio Contractors, 713 F.2d at 174.
 
 
 58
 In Croson's argument that the Plan is not narrowly tailored, it generally urges that the council adopted a plan parallel to the one approved in Fullilove, but without the administrative provisions which shaped the Fullilove plan to its narrow role. Croson alleges that the Richmond Plan contains no adequate waiver provisions to give it relief from its claimed inability to obtain a responsible MBE subcontractor at a competitive price.
 
 
 59
 The MBE statutory provision approved in Fullilove "outlin[ed] only the bare bones" of a program, but made a sufficient number of "critical determinations" so that Congress could permissibly rely upon "the administrative agency to flesh out this skeleton." Fullilove, 448 U.S. at 468, 100 S.Ct. at 2769. The structure of the Richmond Plan sufficiently parallels the federal plan to meet Croson's general objections. We believe that the administrative regulations promulgated pursuant to the ordinance provided adequate waiver procedures to protect the City and non-MBEs from possible abuse of the Plan by MBEs and to provide relief to non-MBEs where the Plan's requirement cannot be achieved. In judging the adequacy of the waiver provision of the Richmond Plan, we note first that for a minority business to be considered under the general procurement ordinance it must be "responsible." The Richmond Plan authorizes the Director of the Department of General Services to promulgate rules which "shall allow waivers in those individual situations where a contractor can prove to the satisfaction of the director that the requirements herein cannot be achieved." Richmond, Va., Code Ch. 24.1, Art. VIII-A(B). Pursuant to this city legislative provision, the Director promulgated "purchasing procedures"[15] and an explanation of the required contract clauses.[16] Among other things, the "purchase procedure" provides that the appropriate city officer must:
 
 
 60
 9. Verify that the Minority Business Enterprise (MBE) is a minority-owned and controlled business.
 
 
 61
 10. Approve or disapprove the apparent low bidder's Minority Business Utilization Form and/or make recommendations for any partial or complete waiver.
 
 
 62
 11. Disapprovals, or any types of waivers, shall be returned to the Department of General Services accompanied by a written explanation.
 
 
 63
 12. Return the Minority Business Utilization Form, UP-1 to the Department of General Services with a recommendation for approval, disapproval, partial or complete waiver within three (3) working days.
 
 
 64
 * * *
 
 
 65
 14. Approve or disapprove waiver, if required.
 
 
 66
 15. Award the construction contract to the lowest responsive and responsible bidder as certified to by the Human Relations Commission as being in compliance with the Minority Business Utilization Plan (ORD. NO. 83-69-59, adopted April 11, 1983).
 
 
 67
 Purchasing Procedure No. 61, City of Richmond, Minority Business Utilization Plan.
 
 
 68
 The "contract clause" instructions provide:
 
 
 69
 To justify a waiver, it must be shown that every feasible attempt has been made to comply, and it must be demonstrated that sufficient, relevant, qualified Minority Business Enterprises (which can perform subcontracts or furnish supplies specified in the contract bid) are unavailable or are unwilling to participate in the contract to enable meeting the 30% MBE goal.
 
 
 70
 In the event a bidder is unable to find a MBE to participate in the contract, the bidder shall submit a request for waiver of the 30% MBE requirement within ten (10) days of bid. The bidder shall indicate in the request for waiver what efforts were made to locate a MBE to participate and the names of firms and organizations contacted with reasons for declinations.
 
 
 71
 Contract Clauses, Minority Business Utilization Plan, p D, H.
 
 
 72
 The Plan's waiver requirements are similar to those upheld in Fullilove. 448 U.S. at 494, 100 S.Ct. at 2782 (appendix to opinion of Burger, C.J.). A non-MBE may obtain a waiver by showing that it made every reasonable attempt to comply with the 30% requirement, but that a sufficient number of qualified MBEs were unavailable or unwilling to participate in the contract. This procedure enables a non-MBE to seek a waiver where the minority contractor is nonresponsive or irresponsible. Croson failed to make the necessary showing. Judge Merhige determined that Croson had made no allegation to the City that Continental had engaged in "price gouging;" it merely alluded to the fact that Continental's price was "substantially higher" than any other price quotation. Croson, slip opinion at 39. The City considered this complaint and denied the request on this and other grounds. If Croson had attempted to demonstrate that Continental had sought to charge an improperly high amount, the City would have had to determine the validity of the allegation consistent with the City's obligation to conduct the review process in a thorough and substantive manner. See South Florida, 723 F.2d at 854. Similarly, if Croson had been more diligent in its search for an MBE, its assertion of Continental's untimeliness might have been grounds for granting a waiver. Croson's conduct, however, hardly bolsters its claim of unfair treatment, and the fact that the City considered and refused Croson's request for a waiver does not support its claim of invalidity of the Plan. In sum, we find that the Richmond Plan, as complemented by its administrative procedures, possesses adequate assurances that waivers can be obtained to avoid improper use of the Plan inconsistent with the purpose of remedying the effects of past discrimination.
 
 
 73
 Croson finally argues that the Plan lacks an adequate appeal mechanism by which such decisions can be reviewed. In the first place, we have found no authority for the proposition that an appeals procedure is a constitutional requirement for set-aside programs. Assuming such a requirement, however, we think the City's procedure is adequate. The City provides a method by which a disappointed bidder may protest an award or a decision to award a contract. See Richmond, Va.Code Ch. 24.1, Art. VII(C). A disappointed bidder not awarded a contract because it failed to obtain a waiver can protest the award under this procedure. In this case, of course, the City decided to re-bid the contract, so there was no award. Absent any showing, however, that the City is wielding its authority to rebid contracts in order to circumvent the appeals procedure, we see no constitutional defect in delaying the availability of an appeal until after the City actually makes a decision to award a contract.
 
 V.
 
 74
 Croson next contends that even if the Plan facially meets Fullilove standards, the City unconstitutionally applied the Plan to Croson's bid on the City jail project. Croson asserts that the City acted unconstitutionally when it denied Croson's request for a waiver because Continental was "unqualified," its price inflated, and its quotation presented after the bid opening. This action, Croson urges, is a further demonstration that the Plan, if not facially rigid, is made inflexible by the manner in which the City administers the Plan and that the very arbitrariness of the City's action makes the program unconstitutional as applied to it.
 
 
 75
 In the first place, a review of the evidence reveals that Continental was qualified to provide the fixtures called for in the contract. Continental appeared on the state listing of MBEs that performed plumbing work and Rose, the Acorn Manufacturer's representative, authorized Continental to be a distributor of Acorn products. The district court found that the price quoted by Continental, though somewhat higher than other quotations, was not so high as to indicate that Continental was taking advantage of the Plan. In reviewing the City's action to see if it acted arbitrarily, we, of course, view all the circumstances upon which it based its decision. No searching inquiry is necessary to reveal Croson's less than exemplary attempts to comply with the requirements of the Plan. According to its own records, its attempt to engage an MBE consisted of telephone calls to six minority businesses in one ten-minute flurry of activity and equally ineffective follow-up procedures. One of these MBEs denied talking to Bonn. Two others testified that Bonn ignored their specific request for follow-up information to allow them to bid. They also testified that they likely would have provided quotations if Bonn had been serious in his approach. Finally, in light of Bonn's continuing efforts to obtain a waiver though fully aware of Continental's ongoing efforts to submit a quotation, the record hardly supports a conclusion that Croson gave the Plan a chance to work as it was designed. The district court found the Plan facially sufficient. We agree. The district court likewise could find no way in which this facially sufficient Plan was unconstitutionally applied to Croson. Nor can we. We do not address Croson's other conclusory attacks on the Plan made without supporting argument.
 
 VI.
 
 76
 The City appeals the district court's denial of attorney's fees under 42 U.S.C. Sec. 1988. Finding that Croson's action was not palpably "vexatious, frivolous, or brought to harass or embarass the defendant," Hensley v. Eckerhart, 461 U.S. 424, 429 n. 2, 103 S.Ct. 1933, 1937 n. 2, 76 L.Ed.2d 40 (1983), we affirm the district court's denial of attorney's fees.
 
 
 77
 For the foregoing reasons, the decision of the district court is
 
 
 78
 AFFIRMED.
 
 
 79
 APPENDIX A
 MINORITY BUSINESS UTILIZATION PLAN
 No. 61
 April 11, 1983
 Under City Ordinance No. 83-69-59, adopted April 11, 1983,the Director of
General Services is authorized to develop the policies and procedures for
implementation of the City's Minority Business Utilization Plan. The
procedures outlined below shall be followed when developing a construction
contract for the City of Richmond:
 RESPONSIBILITY ACTION
 -------------- ------
Using Agency 1. Determines whether the proposed
 (Dept. of Public Works and contract falls within the definition
 Dept. of Utilities only) of a construction contract as
 defined below.
 Definition: Building, altering,
 ----------
 repairing, improving or demolishing
 any structure, building or road,
 street, or highway, and any
 draining, dredging, excavation,
 grading or similar work upon real
 property.
 2. Provided that the contract is a
 construction project, include the
 contract clauses--Minority Business
 Utilization Plan and the Minority
 Business Utilization Plan
 Commitment Form, UP-1, (3 green
 pages) in the bid package. Indicate
 in the Notice to Bidders section of
 the bid package, that this is a
 construction contract which is
 governed under the provisions of
 City Ordinance No. 83-69-5 adopted
 April 11, 1983.
Department of General 3. For construction contracts for
 Services agencies other than the Department
 of Public Works and the
 Department of Public Utilities,
 accomplish the tasks indicated in
 paragraphs 1 and 2, above.
 4. After the bid opening, assure that
 all invitations for bids sumbitted for
 construction projects as defined in
 paragraph 1, above, contains a
 Minority Business Utilization
 Commitment Form, UP-1. If the
 Minority Business Utilization
 Commitment Form, UP-1 is
 missing, or is incomplete, request
 the contractor who appears to be
 the apparent low bidder to complete
 his Minority Business Utilization
 Form and advise the contractor that
 he/she has ten (10) days from the
 date of the bid opening to return
 the completed form, naming the
 minority firm or firms to be
 employed and ownership
 percentages and specifying the
 dollar amount and percentage of
 the contract awarded, by firm(s).
 5. Assure that Bid Bond and other
 bidding requirements have been met
 by the contractor for his or her
 responsiveness to the Invitation for
 Bid.
 6. Forward the construction Invitation
 for Bid package to the Using
 Agency for recommendation and
 review.
 7. Refer the apparent low, responsive,
 bidder's Minority Business
 Utilization Form, UP-1, or Request
 for Waiver, to the Human Relations
 Commission, who shall:
Human Relations Commission 8. Review the Minority Business
 Utilization Form to certify that the
 contractor plans to subcontract out
 thirty percent (30%) of the dollar
 amount of the contract.
 9. Verify that the minority Business
 Enterprise (MBE) is a minority-
 owned and controlled business.
 10. Approve or disapprove the apparent
 low bidder's Minority Business
 Utilization Form and/or make
 recommendations for any partial or
 complete waiver.
 11. Disapprovals, or any types of
 waivers, shall be returned to the
 Department of General Services
 accompanied by a written
 explanation.
 12. Return the Minority Business
 Utilization Form, UP-1 to the
 Department of General Services
 with a recommendation for
 approval, disapproval, partial or
 complete waiver within three (3)
 working days.
Department of General 13. Review the recommendations from
 Services the Human Relations Commission
 and the Using Agency to resolve all
 non-concurrences, if required.
 14. Approve or disapprove waiver, if
 required.
 15. Award the construction contract to
 the lowest responsive and
 responsible bidder as certified to by
 the Human Relations Commission
 as being in compliance with the
 Minority Business Utilization Plan
 (ORD. NO. 83-69-59, adopted April
 11, 1983).
Using Agency 16. The Using Agency and the Human
 Relations Commission shall have the
 responsibility of monitoring the
 contractor's adherence to all of the
 contract provisions to include the
 Minority Business Utilization
 Commitment. Any discrepancies
 found shall be reported in writing
 to the Department of General
 Services.
 
 APPENDIX B
 CONTRACT CLAUSES
 MINORITY BUSINESS UTILIZATION PLAN
 
 80
 THIRTY PERCENT (30%) AWARD REQUIREMENT FOR CONSTRUCTION
 
 Revised July 12, 1983
 
 81
 A. Pursuant to Ordinance No. 83-69-59 of the City of Richmond, all construction contracts shall provide for at least thirty percent (30%) of the contract amount be awarded or subcontracted to Minority Business Enterprises (MBE).
 
 
 82
 B. The bidder agrees that a minimum of thirty percent (30%) of the dollar value of any resulting contract shall be awarded or subcontracted to minority-owned businesses, contractors or subcontractors. The bidder further agrees that by signing this bid, he/she shall provide all of the information required as indicated on the Minority Business Utilization Plan Commitment Form, UP-1, dated July 12, 1983. The bidder also agrees that he/she shall complete the aforementioned form, naming the MBE to be employed and its ownership percentages in addition to the dollar amounts and percentage of the contract awarded to such MBE within ten (10) days from the bid opening date. If the Minority Business Utilization Plan Commitment Form, UP-1 is not received by 5:00 P.M., of the 10th day following bid opening (or first business day thereafter, if the 10th day falls on a non-working day), then the award shall be cancelled and the City shall reconduct the award procedure as if bids were just being opened. The contractor who failed to arrange his commitment to a MBE during the 10-day grace period, shall be deemed to be in non-compliance with the terms of the bid until and unless it is determined that no other bidder could comply with the MBE requirement and compliance thereto is waived by the City.
 
 
 83
 C. Contractors or proposed bidders may contact the Metropolitan Business League, phone number (804) 649-7473, the Human Relations Commission, phone number (804) 780-4111, Richmond Redevelopment and Housing Authority, phone number (804) 644-9881, State Minority Business Enterprise Office, phone number (804) 786-5560, or the Department of General Services, phone number (804) 780-6124, for assistance in locating a MBE to participate in this contract.
 
 
 84
 D. No partial or complete waiver of the foregoing requirement shall be granted by the City other than in exceptional circumstances. To justify a waiver, it must be shown that every feasible attempt has been made to comply, and it must be demonstrated that sufficient, relevant, qualified Minority Business Enterprises (which can perform subcontracts or furnish supplies specified in the contract bid) are unavailable or are unwilling to participate in the contract to enable meeting the 30% MBE goal.
 
 
 85
 E. If it appears that less than 30% of the contract funds or whatever lower percentage has been authorized by waiver will be expended to a MBE, this contract shall be suspended or terminated unless a waiver is granted.
 
 
 86
 F. By execution of the contract, the contractor agrees to cooperate with the City by providing data on MBE utilization during the full period of the contract.
 
 
 87
 G. Failure to comply with these terms or use the MBE (or as may be modified by a waiver) as stated in the contractor's assurance shall constitute a breach of contract.
 
 
 88
 H. In the event a bidder is unable to find a MBE to participate in the contract, that bidder shall submit a request for waiver of the 30% MBE requirement within ten (10) days of bid. The bidder shall indicate in the request for waiver what efforts were made to locate a MBE to participate and the names of firms and organizations contacted with reasons for declinations.
 
 
 89
 I. No work covered under the terms of the contract shall begin until the minimum 30% award requirement has been met or a written waiver granted by the City has been issued.
 
 WILKINSON, Circuit Judge, dissenting:
 
 90
 Though the Supreme Court has not proscribed all preferences, its decisions have recognized the dangers inherent in the classification of American citizens on the basis of their race. To protect against such dangers, the Court has directed that the remedy of racial preferences be dispensed only under strict conditions. Here the majority simply disregards the need for such conditions. It abandons the caution required by Supreme Court precedent and issues what amounts to an invitation to the uninhibited and ill-considered enactment of racial distinctions in local ordinances across the land. I cannot support such encouragement--either by this Court or by local authorities--of classifications shown throughout the history of this country to have the frequently-realized potential for social division and individual injustice.
 
 
 91
 I do not question for an instant the desirability of increased participation of minority business enterprises in the field of public contracts. Hasty formulas, however, only replicate the discrimination they purport to remedy and balkanize the body politic along lines of national origin and race. The program adopted by the City of Richmond runs afoul of the boundaries within which racial preferences may be pursued. Its set-aside ordinance is defective in at least two respects.
 
 
 92
 First, the city is simply unauthorized under Virginia law to enact an ordinance of this type. The sole potential source of state authority--allowing municipalities to enact procurement policies consistent with "competitive principles"--is directly contrary to the existence of a power to enact racial set-asides. It stretches the imagination to conclude that a dispensation of preferment on a basis wholly unrelated to performance or cost is consistent with competitive principles. Moreover, within the context of competition, this ordinance establishes an especially egregious regime of racial discrimination. Unlike other set-asides, it does not require minority subcontractor participation in all contracts, but draws further racial classifications by requiring only non-minority prime contractors to abide by its strictures.
 
 
 93
 Second, the factual findings made by the Richmond city council are woefully inadequate, as a matter of federal law, to ensure that the ordinance does more than "merely express[ ] a ... desire to prefer one racial or ethnic group over another." Fullilove v. Klutznick, 448 U.S. 448, 497, 100 S.Ct. 2758, 2784, 65 L.Ed.2d 902 (Powell, J. concurring). The findings made here pay scarcely more than lip service to the indispensable preconditions for racial preferences by government. They neither support a conclusion of discrimination nor suggest the boundaries for a remedy were the need properly established. If we uphold a racial preference built on a foundation so infirm, we have in effect dispensed with the requirement for any findings at all. Local authorities need only recite an approved purpose and their racial preference will stand. I would have thought it obvious that even the best intentions of lawmakers, standing alone, are inadequate to ensure that preferences do not, in fact, diminish the dignity that resides within all individuals regardless of their race.
 
 
 94
 * It is clear that Virginia law limits the powers of local authorities to enact racial set-asides in public contracts. This Court is duty-bound to consider and abide by those limits. See Schmidt v. Oakland Unified School District, 457 U.S. 594, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982). We do not write on a clean slate of state law, for Virginia has made clear both the severity of its limitations on municipal authority and the centrality of its concern for competition in public contracts. The putative grant of local authority here is the power to enact procedures of procurement "based on competitive principles." Va.Code Sec. 11.35(D). The set-aside, however, introduces into the procurement process a factor wholly irrelevant to competitive concerns--the racial status of those who own or control a particular business. To equate, as does the majority, the race-neutrality of competitive contracting with the race-consciousness of numerical set-asides is to disregard principles of competition and flout settled Virginia law.
 
 
 95
 The majority misapprehends the relationship between state and local government in Virginia. The Dillon Rule limits the powers of local governing bodies to "those powers expressly granted, those necessarily or fairly implied therefrom, and those that are essential and indispensible." Board of Supervisors v. Horne, 216 Va. 113, 117, 215 S.E.2d 453, 455 (1975). See 1 J. Dillon, Commentaries on the Law of Municipal Corporations, Sec. 237 (5th ed. 1911). Under this rule, the state legislature is the source of all municipal authority, and its grants of authority are to be narrowly construed. Despite the dilution of the Dillon Rule in other jurisdictions, Virginia continues to follow it closely. See County Board v. Brown, 229 Va. 341, 329 S.E.2d 468 (1985). The General Assembly refused to follow the recommendation of the Commission on Constitutional Revision that the rule be reversed. Instead, the Assembly deleted the proposed repeal of the Dillon Rule from the revised state constitution. See Horne, 215 S.E.2d at 456; Spain, The General Assembly and Local Government: Legislating a Constitution 1969-70, 8 U.Rich.L.Rev. 387, 403-04 (1974).
 
 
 96
 The force of the Dillon Rule in Virginia is evident from the strictness with which it is applied. Absent an express grant of the specific power in question, the Supreme Court of Virginia rarely upholds local authority to exercise the power. See, e.g., Brown, 329 S.E.2d 468 (authority to lease "unused" county land does not allow locality to lease parking lot to a developer); Tabler v. Board of Supervisors, 221 Va. 200, 269 S.E.2d 358 (1980) (authority to regulate trash does not allow locality to require deposits on disposable containers); Horne, 215 S.E.2d 453 (authority to require subdivision plat approval does not allow locality to suspend filing of applications for such approval).
 
 
 97
 The Supreme Court implies local power only where an express power would be rendered ineffective absent the implication. See, e.g., Gordon v. Board of Supervisors, 207 Va. 827, 153 S.E.2d 270 (1967) (authority to create commission to develop airport necessarily includes power to lend money to commission because without such power, commission would be rendered ineffective); Light v. City of Danville, 168 Va. 181, 190 S.E. 276 (1937) (authority to build dam necessarily includes power to condemn land for that purpose). It does not imply grants of power to localities on matters of public policy as sensitive and controversial as that in issue here. See Commonwealth v. County Board, 217 Va. 558, 232 S.E.2d 30 (1977) (authority to bargain with public employee union not implied from power to enter into contracts, to hire employees, and to fix terms and conditions of employment). And it would never imply a grant of municipal power in the face of such strong statutory language to the contrary.
 
 
 98
 Against this backdrop of restrictive state law, the majority's implication of the city's power to enact a racial set-aside is simply untenable. The majority does not contend that the power to adopt this program is expressly granted by the Virginia Public Procurement Act. Instead, it concludes that the power is "fairly implied" from the grant of authority to base procurement policies "on competitive principles." Far from being implied, however, the exercise of local authority here contradicts the state requirement. The power implied by the majority, consequently, finds its source in sheer judicial fiat rather than in state law.
 
 
 99
 Though the Virginia Supreme Court has not to date addressed the meaning of "competitive principles" as used in the Virginia Public Procurement Act, the term can hardly be obscure, especially in the context of competitive bidding for public contracts. The General Assembly has defined the term in the procedures it requires for municipalities that do not adopt their own procurement programs. The Assembly values fair and open bidding on terms of price and quality in the hope that public projects will be awarded to competent contractors at the lowest price possible.
 
 
 100
 The Assembly's view of "competitive principles" is evident in its statement of general policies regarding procurement. The statement reflects a concern for equality of treatment for all contractors, and a distaste for arbitrary exclusions unrelated to the cost and quality of goods and services:
 
 
 101
 To the end that public bodies in the Commonwealth obtain high quality goods and services at reasonable cost, that all procurement procedures be conducted in a fair and impartial manner with avoidance of any impropriety or appearance of impropriety, that all qualified vendors have access to public business and that no offeror be arbitrarily or capriciously excluded, it is the intent of the General Assembly that competition be sought to the maximum feasible degree, that individual public bodies enjoy broad flexibility in fashioning details of such competition, that the rules governing contract awards be made clear in advance of the competition, that specifications reflect the procurement needs of the purchasing body rather than being drawn to favor a particular vendor, and that purchaser and vendor freely exchange information concerning what is sought to be procured and what is offered.
 
 
 102
 Va.Code Sec. 11-35.G (emphasis added).
 
 
 103
 The specific details of the state procurement plan implement its guiding principle, the achievement of high-quality, low-cost public projects. "Competitive sealed bidding" includes at least five elements: 1) written invitations to bid including specifications and contract terms, 2) public notice of the invitation to bid, 3) public opening and announcement of all bids received, 4) evaluation of bids based on requirements found in the invitation, and 5) award of the project to the lowest responsible and responsive bidder. Va.Code Sec. 11-37. These requirements are, of course, familiar in the context of public contracts, for their beneficial effects are well-established and widely desired.
 
 
 104
 The state's own program for local procurement therefore suggests a meaning of "competitive principles" consistent with the plain meaning of the term: a process in which every able entrant participates freely, with the yardsticks of performance being the lowest cost for the best quality. There is no hint that the state meant to employ the city's conception of competition--one that apportions success on the basis of race.
 
 
 105
 The state, of course, was not blind to the need for minority business participation, but the way it chose to pursue that goal is revealing. It requires those municipalities following its procedures to include minorities in any direct solicitation of bids, Va.Code Sec. 11-37, and has a general policy of encouraging minority participation in a way "consistent with all other provisions of this chapter." Va.Code Sec. 11-48. There are no numerical set-asides of contract or subcontract awards, but instead a general policy of encouraging minorities to enter the competitive process.
 
 
 106
 The Richmond plan, by contrast, is not an invitation to compete but a promise of preferment. It introduces into the otherwise cost- and quality-conscious system a factor wholly extraneous to those concerns. Able entrants in the market for subcontracts are denied the right to compete on equal terms. Results are predetermined in a way that does not comport with savings in the public fisc or quality in the public product.[1]
 
 
 107
 One cannot equate the Virginia requirement of "competitive principles" with "monopoly privileges in a ... market for a class of investors defined solely by racial characteristics." Fullilove, 448 U.S. at 532, 100 S.Ct. at 2803 (Stevens, J., dissenting). Here, the city of Richmond has granted minority subcontractors at least oligopoly power in 30% of all subcontracts let by non-minority prime contractors. Even a limited grant of monopoly power to those not necessarily best qualified to perform a contract has adverse consequences. First, because those with such privileges have "the power to control prices or exclude competition," United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), monopoly power results in higher prices than those that would prevail under competition. See generally, F. Scherer, Industrial Market Structure and Economic Performance 14-16 (2d ed. 1980); P. Samuelson & W. Nordhaus, Economics 511-16 (12th ed. 1985). Second, the exercise of monopoly power may result in smaller output of a product than a competitive market would realize. See generally, J. Robinson, Economics of Imperfect Competition, 143-154 (2d ed. 1969). Samuelson & Nordhaus, supra at 518. These effects combine to produce a net social loss and a decline in aggregate welfare due to efficiency losses associated with monopoly power. Scherer, supra, at 459-74; Samuelson & Nordhaus, supra, at 518-19.
 
 
 108
 The facts of Croson's case illustrate vividly the adverse effects of a set-aside program that would not occur if the city adhered to the state requirement of competitive principles. Croson in effect faced a set-aside far greater than 30%, for the supply of plumbing fixtures represented approximately 75% of the cost of the total project. Croson was obliged, therefore, to award this subcontract to a preferred subcontractor to meet the 30% set-aside. The minority subcontractor's price for the plumbing fixtures ($96,677.14) was $6,183.29 higher than the competitive market price ($90,493.85). This would represent nearly a 7% increase in the cost of these items. If Croson had bid the job using this figure, additional overhead and bond expenditures would have brought the extra cost from using the MBE to $7,663.16. Limited public funds would thus be used on a project actually requiring a much lesser expenditure, and alternative projects--desirable and achievable in a competitive market--would be foregone or delayed.
 
 
 109
 The district court believed that "Croson's experience ... establishes that the city considers it immaterial that an MBE provides a somewhat higher price than non-MBEs." It rejected the argument that "any measure that may increase the cost of a contract to the city in the short run" was inconsistent with "competitive principles" by pointing to other state requirements, such as bonding, that increase costs. Set-asides, however, are quite distinct from other cost increasing measures. Racial set-asides introduce into the process a factor far removed from the business concerns that prompted a requirement for such measures as bonds that serve to insure completion of contract work. In addition, other items that increase costs are, consistent with the Dillon Rule, specifically authorized by the state. Bid bonds, performance bonds, and payment bonds, for example, are authorized by Va.Code Secs. 11.57, 11.58, 11.61 and 11.62. Absent such authorization, there would be a serious question as to the authority of municipalities to adopt these requirements. See, e.g., Tabler, 269 S.E.2d 358; Horne, 215 S.E.2d 453.[2]
 
 
 110
 Even if one were to conclude that the city could generally increase costs by taking a factor such as race into account, competitive principles would require at the very least that the city do so in a neutral manner, requiring all contractors to face the same set of increased costs for subcontracting work wherever possible. The city, however, has simply not adopted such a plan. This is evident from the fact that MBE prime contractors are exempted from the MBE subcontracting requirement. These prime contractors, therefore, enjoy a competitive advantage over their non-MBE counterparts because they can compete freely on the market for the lowest priced subcontractors, regardless of racial identity. Richmond City Code, Ch. 24.1, Art. VIII-A(A).
 
 
 111
 This reliance upon race in derogation of competitive principles is, in the last analysis, not a matter of market theory. In requiring a competitive system, the Virginia General Assembly did more than adopt an economic view. Strict procedures for competitive bidding have attempted to rid state and local government of the nemesis of kickbacks, rigged bids, and political favoritism that has bedevilled the field of public purchasing and supply almost since the advent of government. Gains in integrity have been tenuous and hard-won. To introduce a new form of favoritism invites renewed manipulations of a process which, to inspire public confidence, must remain even-handed and scrupulously fair. That this step backwards is blessed by a federal court against the aspirations of Virginia law is doubly regrettable.
 
 II
 
 112
 The Richmond city council not only exceeded its authority under state law. It also failed to abide by the requirements of federal law when it enacted this set-aside. It is, of course, true that the Supreme Court has yet to articulate definitive standards for the review of such racial classifications under the equal protection clause. See, e.g., Fullilove, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); University of California Regents v. Bakke, 438 U.S. 265, 98 S.Ct 2733, 57 L.Ed.2d 750 (1978). Few would deny, however, that "[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." Fullilove, 448 U.S. at 491, 100 S.Ct. at 2781 (Opinion of Burger, C.J.). Here the majority abdicates that responsibility by allowing a racial preference to stand on only the barest of public records.
 
 
 113
 The need for findings prior to enactment of a racial preference is threefold. Substantial factual findings are necessary to determine whether the purported remedy is indeed aimed at past discrimination or actually represents a bald racial preference. See Fullilove, 448 U.S. at 498, 100 S.Ct. at 2784 (Powell, J., concurring). Secondly, a court can determine that the remedy is strictly tailored to the scope of the violation "only if it is certain that the persons shaping and implementing the plan understood the nature and extent of the past discriminatory practices." Valentine v. Smith, 654 F.2d 503, 508 (8th Cir.) cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). Thirdly, substantial findings protect against the casual use of racial distinctions and remind a public body of the seriousness of the step it is set to undertake. None of these vital purposes is served by the meager findings of the Richmond City Council in this case.
 
 
 114
 The majority's attempt to label the findings in this case as legislative and hence all but immune from judicial scrutiny simply leaves localities unrestricted in enacting public distinctions based on race. Nothing the Supreme Court has said can be construed to give localities such license in this most sensitive of all constitutional arenas. Indeed, local bodies seeking to enact set-asides bear a heavier burden of justification than that required of Congress in Fullilove, and therefore must make more specific findings of discrimination before adopting racial preferences. See Fullilove, 448 U.S. at 515-16 n. 14, 100 S.Ct. at 2794 n. 14. (Opinion of Powell, J.). Localities do not possess the unique remedial powers of the Congress over section 5 of the Fourteenth Amendment. See id., 448 U.S. at 483-84, 100 S.Ct. at 2777-78. (Opinion of Burger, C.J.). Accordingly, they may act only in response to well-established violations of well-defined extent. Moreover, when localities adopt set-asides, it is not always clear that a majority is acting on behalf of a minority rather than in its own favor. It is heartening that many localities are now governed by members of minority communities. At the same time, enactment of set-asides in this context may represent abuse of the political process rather than remedial action to benefit true minority interests. See generally, Ely, The Constitutionality of Reverse Racial Discrimination, 41 U.Chi.L.Rev. 723 (1974).
 
 A.
 
 115
 The sparse inquiry of the Richmond City Council simply failed to adduce the significant and detailed evidence of past discrimination on which courts have conditioned use of remedial racial classifications. See Janowiak v. Corporate City of South Bend, 750 F.2d 557, 561 & 564 (7th Cir.1984) petition for cert. filed, 53 U.S.L.W. 3896 (U.S. June 10, 1985) (No. 84-1936); South Florida Chapter of the Associated General Contractors of America, Inc. v. Metropolitan Dade County, 723 F.2d 846, 851-53 (11th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); Valentine, 654 F.2d at 508. Though the council adopted the set-aside plan after a public hearing, the paucity of the evidence adduced by this hearing suggests that the council performed only the most cursory inquiry into the necessity of a program for which the constitution requires searching examination.
 
 
 116
 Only seven speakers addressed the council in the most general terms during its consideration of the set-aside at the very end of a five hour council meeting. Two spoke in favor of the plan, while five opposed it. The city manager and a city councilman stated in conclusory fashion that there was discrimination in the construction industry, though the city attorney specifically denied that the city had discriminated in any individual case in the past. Several council members referred to a study purporting to show that only .67% of the city's $124 million in construction contracts from 1978-83 had gone to minority firms. The record reveals, however, that this "study" is merely a list of city contracts without any reference whatsoever to the racial identity of any contractors. In fact, the city manager testified that overall minority participation in city contracts was 7-8%.
 
 
 117
 To uphold a racial distinction on this record makes findings nothing more than a charade to justify a pre-conceived result. The only potentially useful evidence actually before the council was the small percentage of prime construction contracts awarded by the city to minority businesses. Statistics, however, are not self-explanatory. Instead, they function as "warning signals" that "raise questions rather than settle them" and "call for further investigations into the qualitative actions and attitudes that produce the statistical profile." United States Commission on Civil Rights, Affirmative Action in the 1980s: Dismantling the Process of Discrimination 31 (1981). See Johnson v. Transportation Agency, 748 F.2d 1308, 1319 (9th Cir.1984) (Wallace, J., concurring in part, dissenting in part). Where the need to show actual discrimination is so great, statistics cannot be invoked as a convenient "short-cut around the critical need for causal evaluation and analysis." Johnson, 748 F.2d at 1319. Because statistics always require inquiry and explanation, "evidence of statistical disparity alone fails to prove past discrimination and cannot justify the adoption of a remedial plan that may discriminate against non-minorities." Janowiak, 750 F.2d at 564.
 
 
 118
 The majority, however, fails to recognize that statistical disparity suggests only the need for an inquiry, not the end of it. Though statistical disparity is consistent with a conclusion of past racial discrimination, it may also be the product of other factors. See, e.g. Milliken v. Bradley, 418 U.S. 717, 756 and n. 2, 94 S.Ct. 3112, 3133 and n. 2, 41 L.Ed.2d 1069 (1974) (Stewart, J., concurring). In particular, the availability of minority firms to perform quality work at a competitive cost must be examined. The failures of city council or prime contractors to make awards to non-existent or non-competitive concerns is more deeply regrettable than it is discriminatory. Such a finding would not support an imposition of the present competitive disadvantage on non-minority primes and subs that neither participated in nor benefitted from any prior malefaction.[3]
 
 
 119
 The cases upholding racial preferences present a dramatic contrast to the sparse evidence relied upon here. In South Forida Chapter of the Associated General Contractors of America v. Metropolitan Dade County, Florida, 552 F.Supp. 909, 925-26 (S.D.Fla. 1982), aff'd 723 F.2d 846 (11th Cir.), cert denied, --- U.S. ----, 105 S.Ct. 220 (1984), the municipality's conclusion of past discriminatory practices rested not only on statistical disparity but also on evidence of "identified discrimination," verified by independent investigations and extensive factual findings. In Bratton v. City of Detroit, 704 F.2d 878 (6th Cir.) vacated and remanded on other grounds, 712 F.2d 222 (6th Cir.1983), cert. denied, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984), the "inference" of intentional discrimination that arose from severe statistical disparity was supported with detailed evidence of intentional discrimination in the relevant employment context. The conclusion was further bolstered by "numerous independent studies." See id. at 889. No such evidence was considered here; the Richmond city council relied on raw statistics. Absent further inquiry into the meaning of the numbers before it, the council's action does not proceed from a constitutional or statutory violation and hence lacks even minimal safeguards for adoption of a racial set-aside.
 
 B.
 
 120
 Detailed factual findings are also necessary to ensure that, even where an identified need exists, "the use of [racial] classifications extend[s] no further than the established need of remedying the effects of past discrimination." Dade County, 723 F.2d at 852. Though factual findings alone do not ensure a "narrowly tailored" remedy, Fullilove, 448 U.S. at 490, 100 S.Ct. at 2781, the absence of such findings makes it impossible to limit the remedy appropriately, for there is no evidence of the scope of past discrimination at which the program is aimed. A court can determine that the remedy substantially furthers its asserted purpose only if it is certain that the persons enacting the remedy know what it was they intended to redress. See Valentine, 654 F.2d at 508. The deficiencies in the record in this regard are even more glaring than the failure to identify the discriminatory predicate.
 
 
 121
 First, the only potential evidence of past discrimination considered by the city council was unrelated to the remedy actually adopted. The evidence of statistical disparity involved the percentage of prime contracts awarded to minority businesses by the city. In response to this evidence, the council enacted a set-aside that required increased use of minorities in subcontracts. Council, however, considered absolutely no evidence on the minority subcontractor market. The district court essentially allowed the council to assume discrimination against minority subcontractors from evidence of minority prime contractor underrepresentation. Yet it is just such offhanded reliance upon racial assumptions that the requirement of findings is designed to inhibit. Though the two situations may be related, nothing before the council demonstrated that this was so. The nexus between violation and remedy was thus left to conjecture in violation of controlling Supreme Court precedent. See Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 2588, 81 L.Ed.2d 483 (1984); Dayton County Board of Education v. Brinkman, 433 U.S. 406, 419-20, 97 S.Ct. 2766, 2775-76, 53 L.Ed.2d 851 (1977); Milliken, 418 U.S. at 738, 94 S.Ct. at 3124; Swann, 402 U.S. at 16.
 
 
 122
 Second, the 30% set-aside goal emerges from a vacuum. Rather than a goal narrowly tailored to meet a specific need, the 30% figure is arbitrary and unsupported. No consideration was given, for example, to the number of minority firms available to perform contracts under this set-aside, despite the testimony of several witnesses before the city council that the set-aside goal was unrealistic. Though the waiver provisions may temper to some extent the quota, they do not absolve the city council of its responsibility to ensure that the goal chosen relates to demonstrated availability and need. Legislative bodies may not rectify arbitrary action through waiver provisions for which no guidelines or standards are even suggested. See Richmond City Code, Ch. 24.1, Art. VIII-A(B). The absence of any support for the percentage figure in the set-aside enhances the danger of an overbroad imposition of competitive disadvantage on non-minority contractors.
 
 
 123
 Finally, the reach of the remedy adopted here bears no relation to any geographical showing of discrimination. MBEs from all over the country may participate in the benefits of the set-aside program, yet no investigation was made as to whether any out-of-state MBEs had ever been subject to discrimination at the hands of public bodies in Richmond. Why an MBE in Pennsylvania should receive a competitive windfall in Richmond is a mystery. Surely the ordinance would have been less arbitrary if it permitted a waiver of the percentage set-aside in the event no minority subs were available in Richmond. See, e.g. Ohio Contractors Association v. Keip, 713 F.2d 167, 169 (6th Cir.1983) (set-aside limited to minority business enterprises owned and controlled by residents of Ohio). The adoption of a broad remedy for which any affirmative support is lacking imparts a randomness to the identity of victims and beneficiaries that proper findings can do much to alleviate.
 
 
 124
 Dade County again provides a significant contrast. There, racial preferences are narrowly tailored through a series of specific steps required whenever they are to be employed. No broad remedies were enacted, instead, racial preferences are considered on a project-by-project basis. This consideration occurs in a three-stage administrative review where the whole range of race-conscious remedies--including recruitment for competitive bidding--may be considered. In no case may a set-aside be used unless three certified minority contractors are available. Finally, the entire scheme of considering race-conscious remedies is subject to annual review and assessment to determine its continuing desirability. See, Dade County, 723 F.2d at 853-854. Not a one of these ameliorating features appears in the Richmond ordinance.
 
 IV
 
 125
 My intention is not to find petty fault or to demean the generous impulse from which remedial preferences spring. This question is not an easy one, and the Supreme Court has struggled to reconcile the American belief in the primacy of the individual with the need to overcome a legacy of discrimination based on race. The Court has not forbidden all remedial preferences. Rather it has flashed an amber light. Today the majority ignores that signal of caution. It approves the casual adoption of a crude numerical preference that can only impair the ideal that all stand equally before the law and postpone the day of human fellowship that transcends race.
 
 
 
 [1]
 The action was originally filed in the Circuit Court of the City of Richmond. It was removed to the federal district court pursuant to 28 U.S.C. Sec. 1441(a) (1982). The district court assumed original jurisdiction over Croson's federal constitutional claims pursuant to 28 U.S.C. Sec. 1331 (1982) and over Croson's state law claims by pendent jurisdiction. After the district court denied Croson's motions for summary judgment, the case was submitted on depositions, stipulations of evidence, and limited testimony
 
 
 [2]
 In a companion case Mega Contractors, Inc. v. City of Richmond, CA 84-0022-R, the district court ruled for the city and Mega did not appeal
 
 
 [3]
 The Plan defines an MBE as "[a] business at least fifty-one percent of which is owned and controlled or fifty-one percent minority-owned and operated by minority group members, or in case of a stock corporation, at least fifty-one percent of the stock which is owned and controlled by minority group members." Richmond, Va.Code Ch. 24.1, Art. I(F) (Part B) (27.10). "Minority group members" are defined as "[c]itizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." Richmond, Va.Code Ch. 24.1, Art. I(F) (Part B) (27.20)
 
 
 [4]
 The district court was unable to determine the exact number. (It was either 5 or 6). Telephone records submitted at trial, however, indicated that Bonn's September 30 long-distance telephone calls to all of these MBEs lasted a total of less than ten minutes. Officers of one of the MBEs testified they never received Bonn's call and it appears they were absent from the office. Representatives of two others testified that they were interested in bidding and asked Bonn to send them bid specifications in order to prepare price quotations for the fixtures, but that he never complied with this request
 
 
 [5]
 Chapter 24.1, Article VII(C) of the Richmond Code provides that a disappointed bidder may appeal an award of a contract to another party. The appeal mechanism is sufficiently broad to permit appeal of a decision denying a contract to a losing bidder due to his failure to comply with the minority business utilization plan, but the appeal procedures are not available until after an award has been made. Here, because the City announced its decision to reopen the bidding process, no award was made
 
 
 [6]
 Richmond Va. Ordinance No. 82-294-270
 
 
 [7]
 Richmond Va. Ordinance No. 83-69-59. It was later amended by Ordinance No. 83-127-116 on June 20, 1983
 
 
 [8]
 Exempt public bodies are only subject to certain sections of the public procurement act not germane to the issues in this appeal
 
 
 [9]
 Most states, including the state of Virginia, have similar offices or departments of Minority Business Enterprise. See Va.Code Sec. 2.1-64.32 (Supp.1985)
 
 
 [10]
 The Sixth Circuit in Ohio Contractors wrote at greater length and more emphatically on the authority of state government in this area:
 No enabling provision is required to authorize a state government to enact legislation to prevent the denial of equal protection to persons within its jurisdiction. The prohibition against denial of equal protection carries with it the power to prevent such denial and to remedy past violations. When a state legislature takes steps in compliance with the equal protection clause it is acting in the same capacity as that of Congress in adopting legislation to implement the equal protection component of the Fifth Amendment's due process clause.
 713 F.2d at 172.
 
 
 [11]
 The Council heard from: Esther Cooper, MBE owner; Freddie Ray, President of Task Force for Historic Preservation in Minority Communities; Stephen Watts, attorney representing Associated General Contractors of Virginia; Richard Beck, president of a local plumbing contractors' association; Mark Singer, from the electrical contractors' association; Patrick Murphy, American Subcontractors Association; Al Shuman, Professional Estimators Association. In the debate on the ordinance, opponents contended that there was an insufficient number of minority contractors to operate the Plan as proposed, and that implementation of the Plan would lead to inflated bids and would not be conducive to top quality work. Proponents of the Plan, including members of the council, emphasized the history of discrimination in the construction industry, the current difficulties encountered by MBEs in the Richmond area, and the success of similar set-aside programs in other parts of the country. Hearing on Adoption of Minority Business Utilization Plan, Richmond City Council, April 11, 1983
 
 
 [12]
 The Chief Justice thought Congress could take "necessary and proper action" to remedy the effects of past discrimination where "there was a rational basis for Congress to conclude that the subcontracting practices of prime contractors could perpetuate the prevailing impaired access by minority businesses to public contracting opportunities...." Fullilove, 448 U.S. at 475, 100 S.Ct. at 2773. The Chief Justice observed that, "Congress, after due consideration, perceived a pressing need to move forward with new approaches in the continuing effort to achieve the goal of equality of economic opportunity. In this effort, Congress has necessary latitude to try new techniques...." Id. at 490, 100 S.Ct. at 2780. Justice Powell's standard for review of legislative fact-finding is stricter, requiring that a congressional finding be "reasonable." Id. at 503 n. 4, 100 S.Ct. at 2787 n. 4. Because the Richmond Plan satisfies the stricter test, we need not decide which, as a general rule, would be the more appropriate test
 
 
 [13]
 As we have stated, the council's findings are supported by more than bare statistics. It is, therefore, unnecessary to address the question of whether statistical evidence alone is sufficient to provide factual underpinnings for implementation of a set-aside program. Compare Janowiak v. City of South Bend, 750 F.2d 557, 563 (7th Cir.1984) (statistics alone insufficient) with Johnson v. Transp. Agency, 748 F.2d 1308, 1310 n. 2 (9th Cir.1984) (statistical evidence of conspicuous imbalance in workforce adequate)
 
 
 [14]
 Presumably, in its five year period of existence, the Plan will have encouraged a sufficient number of minority businesses that the forces of competition could then rectify the lingering effects of past discrimination. The authorization of the Plan for five years evidences the Council's intention not to give a permanent preference to one racial group, but to offer a narrowly tailored, finite remedy of the current effects of past discrimination. In view of the scope of the problem identified by the City Council, a five year plan is, in our view, unquestionably reasonable. Any new affirmative action plan enacted after that time would be subject to renewed scrutiny through a different glass
 
 
 [15]
 Appendix A to this opinion
 
 
 [16]
 Appendix B hereto
 
 
 [1]
 In contrast to the basis of authority found here, the court in South Florida Chapter of the Associated General Contractors of America v. Metropolitan Dade County, Florida, 723 F.2d 846, 852 (11th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984), found local authority based on a provision that allowed the waiver of competitive bidding. No such authority exists here to justify the set-aside
 
 
 [2]
 The majority's conjecture that the set-aside will increase competition in the long-run is unavailing. It suggests, paradoxically, that we encourage competition by use of non-competitive devices which may soon be removed, leaving those aided by such devices to confront full competition for the first time. In any event, we need not speculate about such outcomes, for the question is simply foreclosed as a matter of state law. The state has not sanctioned the abandonment of settled, commonly understood principles of competition in public contracts on the majority's surmise. It has required, instead, adherence to competitive principles throughout the operation of public procurement programs
 
 
 [3]
 Though the majority attempts to excuse the threadbare nature of the Richmond findings by an argument of "incorporation by reference," we cannot simply assume, absent significant inquiry, that evidence relied on by Congress to adopt a national program supports the addition of another layer of racial preferences in this particular locality. If the broad congressional findings were crucial in supporting local set-asides, there would be little reason for judicial review of these set-asides at all. Courts have, however, felt a need to examine the set of findings in the particular locality. See, e.g. Dade County, 723 F.2d at 853